106 F.3d 1420
 70 Empl. Prac. Dec. P 44,721, 97 Cal. Daily
Op. Serv. 1038,
97 Cal. Daily Op. Serv. 2848,
97 Daily Journal D.A.R. 1551,
97 Daily Journal D.A.R. 5031
Mark A. PHILIPS, Plaintiff-Appellant,
v.
William PERRY, Secretary of Defense; John Dalton, Secretary
of the Navy; M.B. Margosian, Commanding Officer,
Transient Personnel Unit, Puget Sound,
Defendants-Appellees.
 No. 95-35293.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted March 4, 1996.
Filed Feb. 14, 1997.
As Amended April 18, 1997.
 
 Matthew A. Coles, American Civil Liberties Union of Northern California, San Francisco, CA, for plaintiff-appellant.
 E. Roy Hawkens, United States Department of Justice, Civil Division, Washington, D.C., for defendants-appellees.
 Chai R. Feldblum, Georgetown University Law Center, Washington, D.C., amicus curiae, for Human Rights Campaign Fund, et al.
 Melissa Wells-Petry, Family Research Council, Washington, D.C., amicus curiae, for Family Research Council.
 Appeal from the United States District Court for the Western District of Washington, William L. Dwyer, District Judge, Presiding. D.C. No. CV-93-00154-WLD.
 Before FLETCHER, JOHN T. NOONAN, and RYMER, Circuit Judges.
 RYMER, Circuit Judge:
 
 
 1
 Pursuant to the so-called "don't ask/don't tell" policy regarding gays in the military,[1] the Navy discharged Petty Officer Mark A. Philips for stating that he is a homosexual, and for engaging in and saying that he will continue to engage in homosexual acts. Concluding that this circuit has held in a line of cases from Beller v. Middendorf, 632 F.2d 788 (9th Cir.1980), cert. denied, 452 U.S. 905, 101 S.Ct. 3030, 69 L.Ed.2d 405 (1981), through Meinhold v. U.S. Dept. of Defense, 34 F.3d 1469 (9th Cir.1994), that the military may constitutionally discharge members who engage in homosexual conduct, as distinguished from merely having a homosexual status or orientation, the district court granted the Secretary of Defense's motion for summary judgment.[2] Inasmuch as Philips's homosexual acts were sufficient to justify his discharge under the "acts" prong of the statute and regulations, the court declined to address the constitutionality of the Navy's alternative basis for discharge under the "statements" prong--that Philips made a statement that he is a homosexual, and failed to rebut the presumption raised by that statement that he has a propensity to engage in homosexual acts.
 
 
 2
 We agree with the district court, and affirm.
 
 
 3
 * Philips had served for four years as an enlisted member of the United States Navy, garnering an excellent service record. In November 1992, while on board the U.S.S. NIMITZ, Philips told his division officer that he is a homosexual. During a subsequent interview with military personnel, Philips said that he had discovered he was a homosexual within the preceding year; that he had had sexual relations with men about a dozen times and that he would continue to have sex with men; that when ashore he frequented gay bars two or three times a week; that his sexual encounters never involved other military members or occurred on board ship or on a military installation; that the acts were consensual; that he had experienced no problems at work because of his homosexuality; and that he wanted to be processed for discharge, to fight the process, and to win by being retained in the naval service.
 
 
 4
 Soon thereafter, the Navy initiated a discharge proceeding under then-existing regulations, which provided for separation of any service member who engaged in homosexual acts or who stated that he is a homosexual.[3] Philips filed suit and unsuccessfully sought a temporary restraining order to prevent his discharge. An administrative hearing was held, and the board recommended that Philips be discharged based on his statement that he is a homosexual. However, the board's recommendation was never carried out because of the impending new policy regarding gays in the military and several pending lawsuits challenging the constitutionality of the old policy. Eventually the district court entered a stipulated order staying further proceedings in this case until we decided Meinhold.
 
 
 5
 After the new "Policy concerning homosexuality in the armed forces," 10 U.S.C. § 654, and the 1994 DOD Directives became effective, the Navy commenced a second administrative discharge proceeding against Philips under the new policy (with Philips's agreement). The board found that Philips had engaged in homosexual conduct based on his engaging in homosexual acts, as evidenced by his statement that he had done so.[4] The board also found that Philips had engaged in homosexual conduct based on his statement that he is a homosexual.[5] It therefore again recommended that Philips be honorably discharged from the Navy.
 
 
 6
 The district court enjoined Philips's discharge but in later ruling on cross-motions for summary judgment, concluded that Meinhold compelled it to hold that the Navy did not violate equal protection by discharging Philips for engaging in homosexual acts and for intending to continue engaging in such acts. The court also concluded that, under our holding in Pruitt v. Cheney, 963 F.2d 1160 (9th Cir.1991), cert. denied, 506 U.S. 1020, 113 S.Ct. 655, 121 L.Ed.2d 581 (1992), the discharge did not violate the First Amendment.[6] Philips appeals.[7]
 
 II
 
 7
 As the district court's opinion discusses in greater detail, the new policy was the outgrowth of extensive consideration by the executive and legislative branches. Congress made 15 findings in enacting § 654, including that military life is fundamentally different from civilian life; the standards of conduct for members of the armed forces must apply at all times to members whether on or off base and whether on or off duty; the worldwide deployment of United States military forces and potential for involvement of the armed forces in actual combat make it necessary for members of the armed forces to accept living conditions that are characterized by forced intimacy with little or no privacy; the prohibition against homosexual conduct is long-standing and continues to be necessary; and the presence in the armed forces of persons who demonstrate "intent to engage in homosexual acts would create an unacceptable risk to the high standards of morale, good order and discipline, and unit cohesion that are the essence of military capability." 10 U.S.C. §§ 654(a)(8), (9), (10), (12), (13), (15).
 
 
 8
 Section 654 differs from the former policy primarily in that the military may no longer initiate inquiry into a person's sexual orientation. Also unlike the old regulations, the regulations implementing the new policy stipulate that sexual orientation is considered a personal and private matter, and that neither entry into service nor continued service depends on orientation. However, the "don't ask/don't tell" policy continues to provide for discharge of a service member who commits homosexual acts and intends to continue doing so. It mandates that a service member "shall be separated" under regulations prescribed by DOD under three circumstances: if the member has engaged in "a homosexual act or acts" unless the member demonstrates that "such conduct" departs from his usual behavior and is unlikely to recur, and that he does not have a propensity or intent to engage in such conduct, 10 U.S.C. § 654(b)(1)(A), (B), (D); or if the member has stated that he is a homosexual unless he demonstrates that he does not engage or intend to engage in homosexual acts, id. at § 654(b)(2); or if the member has married or attempted to marry a person of the same biological sex, id. at § 654(b)(3).[8] "Homosexual act" is defined as "any bodily contact ... between members of the same sex for the purpose of satisfying sexual desires." 10 U.S.C. § 654(f)(3).[9]
 
 
 9
 Directives issued by then-Secretary of Defense Les Aspin further explain the policy and how it is to be implemented. See DOD Directives 1304.26 (Qualification Standards for Enlistment, Appointment, and Induction), 1332.14 (Enlisted Administrative Separations), 1332.30 (Separation of Regular Commissioned Officers). The Directive under which Philips was processed provides, among other things:Homosexual conduct is grounds for separation from the Military Services under the terms set forth in paragraph H.1.b, below. Homosexual conduct includes homosexual acts, a statement by a member that demonstrates a propensity or intent to engage in homosexual acts, or a homosexual marriage or attempted marriage. A statement by a member that demonstrates a propensity or intent to engage in homosexual acts is grounds for separation not because it reflects the member's sexual orientation, but because the statement indicates a likelihood that the member engages in or will engage in homosexual acts. A member's sexual orientation is considered a personal and private matter, and is not a bar to continued service under this section unless manifested by homosexual conduct in the manner described in paragraph H.1.b.
 
 
 10
 DOD Directive 1332.14(H)(1)(a). Paragraph (H)(1)(b) spells out the findings required for discharge under the "acts," "statement" and "marriage" prongs of § 654(b) in terms that are essentially identical to § 654(b)(1), (2), (3).[10] As there is no dispute that Philips engaged in homosexual acts and intended to continue doing so, and since we agree with the district court that Philips's discharge must be upheld under the "acts" prong alone, we do not consider the "statement" and "marriage" alternatives.
 
 III
 
 11
 Philips argues that § 654 and its implementing regulations violate his right to equal protection because they are not rationally related to any permissible purpose. He complains that under the policy, he was subject to mandatory discharge for engaging in sexual acts with a man, whereas heterosexuals who engage in the same sexual acts are not subject to the policy and its mandatory discharge provisions. Philips submits that none of the government's purported justifications--that the policy prevents the commission of homosexual acts, that it prevents deterioration of unit cohesion and morale, and that it enhances privacy and reduces sexual tension--provides a legitimate rationale for the statute's discrimination.
 
 
 12
 The government counters that all courts to consider the question have upheld the military's constitutional authority to separate service members who engage in homosexual acts. In any event, it contends, the military's policy must be sustained because it advances the legitimate military goals of deterring homosexual acts, promoting unit cohesion, accommodating personal privacy and reducing sexual tension that Congress found go to the "essence of military capability." 10 U.S.C. § 654(a)(14). The government maintains that because the policy is reasonably related to advancing these goals, it is not based on invidious prejudice.
 
 
 13
 As the district court concluded after careful analysis, the slate upon which we write is not clean. We explain why before turning to Philips's specific arguments.
 
 
 14
 * The Due Process Clause of the Fifth Amendment assures every person the equal protection of the laws, "which is essentially a direction that all persons similarly situated should be treated alike." City of Cleburne v. Cleburne Living Center, 473 U.S. 432, 439, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985). Because we have previously held that "homosexuals do not constitute a suspect or quasi-suspect class entitled to greater than rational basis scrutiny under the equal protection component of the Due Process Clause of the Fifth Amendment," High Tech Gays v. Defense Indus. Sec. Clearance Office, 895 F.2d 563, 574 (9th Cir.1990), we subject the policy on gays in the military to rational basis review. We therefore must reject both the request of amici curiae that we apply strict scrutiny to the policy, and Philips's suggestion that classifications along the lines of sexual orientation ought to receive heightened judicial scrutiny.
 
 
 15
 The Supreme Court has further channeled the nature of our review in two critical respects. First, in Heller v. Doe, 509 U.S. 312, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993), it made clear that "rational-basis review in equal protection analysis 'is not a license for courts to judge the wisdom, fairness, or logic of legislative choices.' " Id. at 319, 113 S.Ct. at 2642 (quoting FCC v. Beach Communications, Inc., 508 U.S. 307, 313, 113 S.Ct. 2096, 2101, 124 L.Ed.2d 211 (1993)). Rather, "a classification neither involving fundamental rights nor proceeding along suspect lines is accorded a strong presumption of validity," id., which "must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification," id. at 320, 113 S.Ct. at 2642 (quoting Beach Communications, 508 U.S. at 313, 113 S.Ct. at 2101). Under the standard of rational basis review defined by the Court:
 
 
 16
 [The government], moreover, has no obligation to produce evidence to sustain the rationality of a statutory classification. A legislative choice is not subject to courtroom factfinding and may be based on rational speculation unsupported by evidence or empirical data. A statute is presumed constitutional, and the burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it, whether or not the basis has a foundation in the record. Finally, courts are compelled under rational-basis review to accept a legislature's generalizations even when there is an imperfect fit between means and ends.
 
 
 17
 Id. at 320-21, 113 S.Ct. at 2643 (citations and internal quotations omitted).
 
 
 18
 Second, the Supreme Court has instructed that " 'judicial deference ... is at its apogee when legislative action under the congressional authority to raise and support armies and make rules and regulations for their governance is challenged.' " Goldman v. Weinberger, 475 U.S. 503, 508, 106 S.Ct. 1310, 1313, 89 L.Ed.2d 478 (1986) (quoting Rostker v. Goldberg, 453 U.S. 57, 70, 101 S.Ct. 2646, 2655, 69 L.Ed.2d 478 (1981)). This is especially true where the challenged restriction and its constitutionality are extensively considered by Congress in hearings, committee and floor debate. Rostker, 453 U.S. at 64, 72, 101 S.Ct. at 2651, 2655-56. We are, in addition, to "give great deference to the professional judgment of military authorities concerning the relative importance of a particular military interest." Goldman, 475 U.S. at 507, 106 S.Ct. at 1313. In that context the Court has recognized that "[t]he essence of military service 'is the subordination of the desires and interests of the individual to the needs of the service,' " id. (quoting Orloff v. Willoughby, 345 U.S. 83, 92, 73 S.Ct. 534, 539, 97 L.Ed. 842 (1953)), and we have also acknowledged that "[r]egulations which might infringe constitutional rights in other contexts may survive scrutiny because of military necessities." Beller, 632 F.2d at 811. In these circumstances we "must be particularly careful not to substitute [our] judgment of what is desirable for that of Congress, or [our] own evaluation of evidence for a reasonable evaluation by the Legislative Branch." Rostker, 453 U.S. at 68, 101 S.Ct. at 2653.
 
 B
 
 19
 For nearly twenty years we have upheld the constitutionality of the military's authority to discharge service members who engage in homosexual acts. We have concluded that maintaining effective armed forces is indisputably a compelling governmental purpose and that the policy of excluding from the military those members who engage in homosexual conduct is rationally related to this purpose.
 
 
 20
 In Beller v. Middendorf, 632 F.2d 788 (9th Cir.1980), cert. denied, 452 U.S. 905, 101 S.Ct. 3030, 69 L.Ed.2d 405 (1981), discharged service members claimed that the homosexual conduct prohibited by the Navy regulation then in force was protected as an aspect of the fundamental right of privacy. We drew upon equal protection jurisprudence, applied heightened scrutiny (which we have since held is unnecessary with respect to government regulation of homosexual conduct),[11] and held that "the importance of the government interests furthered [by the regulation] ... outweigh whatever heightened solicitude is appropriate for consensual private homosexual conduct." Id. at 810. As then-Judge Kennedy wrote for the court:
 
 
 21
 The nature of the employer--the Navy--is crucial to our decision. While it is clear that one does not surrender his or her constitutional rights upon entering the military, the Supreme Court has repeatedly held that constitutional rights must be viewed in light of the special circumstances and needs of the armed forces.
 
 
 22
 Id.
 
 
 23
 In Hatheway v. Secretary of the Army, 641 F.2d 1376 (9th Cir.), cert. denied, 454 U.S. 864, 102 S.Ct. 324, 70 L.Ed.2d 164 (1981), an officer convicted by a general court-martial of sodomy in violation of Article 125 of the Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 915 (1976), challenged its constitutionality on a variety of grounds, including that the prosecuting authorities impermissibly selected those committing homosexual sodomy for prosecution. Treating Hatheway's claim as an equal protection argument, we acknowledged that "[c]lassifications which are based solely on sexual preference implicate the 'right to be free, except in very limited circumstances, from unwarranted government intrusions into one's privacy.' " Id. at 1382 (quoting Stanley v. Georgia, 394 U.S. 557, 564, 89 S.Ct. 1243, 1247-48, 22 L.Ed.2d 542 (1969)). However, relying on Beller 's analysis of the interests at stake (and still applying heightened scrutiny), we concluded:
 
 
 24
 The government has a compelling interest in maintaining a strong military force. Underlying our holding in Beller was the judgment that those who engage in homosexual acts severely compromise the government's ability to maintain such a force. That judgment was the basis for our holding that the Navy's policy of discharging all such persons was constitutionally permissible.
 
 
 25
 ... In light of Beller, we hold that selection of cases involving homosexual acts for Article 125 prosecutions bears a substantial relationship to an important governmental interest.
 
 
 26
 Id.
 
 
 27
 In Schowengerdt v. United States, 944 F.2d 483, 490 (9th Cir.1991), cert. denied, 503 U.S. 951, 112 S.Ct. 1514, 117 L.Ed.2d 650 (1992), we considered a substantive due process challenge to the Navy's discharge of Schowengerdt based on his statement that he was a bisexual and his descriptions of bisexual activities in correspondence. We again relied on Beller, observing that it rejected a similar challenge to discharge under similar regulations under a higher level of scrutiny than is now required, and held that the commission of homosexual acts is not an impermissible ground for selective prosecution.
 
 
 28
 Most recently, in Meinhold v. United States Dep't of Defense, 34 F.3d 1469 (9th Cir.1994), we had occasion to construe the regulations in effect before "don't ask/don't tell" which provided for separation of service members based on their being a "homosexual," defined in part as a person who engages in or "desires" to engage in homosexual acts. Meinhold was discharged solely on account of his statement "I am in fact gay." He did not contend that the Navy's policy was constitutionally impermissible to the extent that it related to homosexual conduct; rather, his appeal turned on his status, or classification, as a homosexual. Relying on Goldman, Rostker, Beller, Hatheway, and Schowengerdt, we deferred to the Navy's judgment that the presence of persons who engage in homosexual conduct, or who demonstrate a propensity to engage in homosexual conduct by their statements, impairs the accomplishment of the military mission. However, we were unwilling to condone the Navy's discharge of Meinhold "solely because of a statement of orientation devoid of any concrete, expressed desire or intent to act on his homosexual propensity contrary to military policy." Id. at 1472 (emphasis added).
 
 
 29
 Thus, the district court correctly concluded that this court has consistently held that regulations of the nature at issue here, directed to homosexual acts rather than merely to status or orientation, are constitutional.[12]
 
 C
 
 30
 Philips seeks to distance his case from our precedent on a number of grounds. First, he maintains, the government has offered no legitimate rationale for § 654's harsher punishment of acts committed by gay service members, and has never specified what "act" it believes it has an interest in preventing. Philips postulates, however, that the universe of homosexual "acts" that the government might have an interest in preventing consists of sexual misconduct such as sodomy, which the UCMJ punishes for heterosexuals and homosexuals but which § 654 punishes more severely for homosexuals in that heterosexuals found to have violated the UCMJ are evaluated on a case-by-case basis whereas gay service members are discharged pursuant to § 654(b) with no discretionary review of their actual job performance; and sexual conduct of any other sort, which the policy punishes for homosexuals only and for which heterosexuals are not punished at all. Philips further argues that there is no rationale for treating the same sexual acts more harshly when engaged in by gays or lesbians. These arguments, however, are foreclosed by Beller and Hatheway unless, as Philips also contends, they are either distinguishable or have been undermined by the Supreme Court's subsequent opinions in Palmore v. Sidoti, 466 U.S. 429, 104 S.Ct. 1879, 80 L.Ed.2d 421 (1984), and Cleburne v. Cleburne Living Center, 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985).
 
 
 31
 Philips argues that Beller is distinguishable because our analysis in that case was rooted in substantive due process rather than in equal protection theory. Even though we have indicated that an equal protection objection to the Navy's discharge policy is not the same as a substantive due process objection, Schowengerdt, 944 F.2d at 490 n. 8, we relied on both the analysis and holding of Beller in Hatheway, an equal protection case, and in Meinhold. In any event, as we observed in High Tech Gays, substantive due process and equal protection doctrine are "intertwined for purposes of equal protection analyses of federal action," 895 F.2d at 573 n. 9; and in Beller itself, we imported equal protection analysis (with a heightened level of scrutiny) and found that the military's interests in discharging a service member for homosexual acts were nevertheless compelling. Beller, 632 F.2d at 808.
 
 
 32
 Philips contends that Hatheway is not on point since it did not invoke an equal protection challenge to a separate scheme of regulation punishing gay service members more harshly. However, Hatheway presented the precise situation complained of here: the military's practice of treating service members differently based on whether their acts are homosexual or heterosexual.
 
 
 33
 Philips says that Meinhold is inapposite because the plaintiff there did not challenge the military's regulation of sexual or other conduct. While this is true, our opinion necessarily turned on the military's authority to regulate conduct.
 
 
 34
 Alternatively, Philips argues that even if, contrary to his view, Beller and Hatheway are not distinguishable, neither remains good law since the Supreme Court made it clear in Palmore and Cleburne that one group's dislike for another is not a legitimate reason for governmental discrimination. In support he points to our statement in Pruitt, 963 F.2d at 1165, that, after Palmore and Cleburne, "unexamined effect" cannot be given to Beller and Hatheway so as to preclude an equal protection challenge to military policies that discriminate against gays.
 
 
 35
 In Palmore, the Court applied strict scrutiny to a state court judgment that removed an infant child from the custody of its natural mother solely because she had remarried a person of a different race. It then concluded that the effects of racial prejudice, however real, cannot justify such a racial classification:
 
 
 36
 The Constitution cannot control such prejudices but neither can it tolerate them. Private biases may be outside the reach of the law, but the law cannot, directly or indirectly, give them effect.
 
 
 37
 Palmore, 466 U.S. at 433, 104 S.Ct. at 1882. In Cleburne, the Court struck down a city zoning ordinance that required homes for the mentally retarded, but not other care or multiple-dwelling facilities, to obtain a special use permit. Among other things, the City Council was concerned with the negative attitude of a majority of the property owners located nearby as well as with the fears of elderly residents of the neighborhood. The Court rejected this justification, as "mere negative attitudes, or fear, unsubstantiated by factors which are properly cognizable in a zoning proceeding, are not permissible bases for treating a home for the mentally retarded differently from apartment houses, multiple dwellings, and the like." Cleburne, 473 U.S. at 448, 105 S.Ct. at 3259. Finding that the city's other objections lacked any rational connection to a distinction between the home for the mentally retarded and similar facilities, the Court invalidated the ordinance as applied because "requiring the permit in this case appears ... to rest on an irrational prejudice against the mentally retarded." Id. at 450, 105 S.Ct. at 3260.
 
 
 38
 We disagree with Philips that Cleburne and Palmore overturn Beller and Hatheway. Unlike Beller and Hatheway, Cleburne and Palmore involved status restrictions, not conduct restrictions. Each was therefore a case where the government distinction had no purpose other than raw prejudice. While the same might well be said of the Navy's restriction in Beller if tension between known homosexuals and other members who "despise/detest homosexuality"[13] had been the Navy's only justification, it wasn't, and our opinion did not rest on this ground alone but rather, as we said: "There are multiple grounds for the Navy to deem this regulation appropriate for the full and efficient accomplishment of its mission." Beller, 632 F.2d at 811. Accordingly, Beller is not undercut by Palmore and Cleburne to the extent that it rests on other grounds, and on acts instead of status.[14] See Pruitt, 963 F.2d at 1165. In addition, neither Palmore nor Cleburne involved a military regulation. In Cleburne, a city regulation was challenged and the Court evaluated rationality based on the Court's own view of the record. Cleburne, 473 U.S. at 449, 105 S.Ct. at 3259. But when a military regulation is challenged, courts evaluate rationality with "great deference to the professional judgment of military authorities concerning the relative importance of a particular military interest." Goldman, 475 U.S. at 507, 106 S.Ct. at 1313. Whereas in Cleburne, the City Council's purported justifications had to do only with "mere negative attitudes, or fear, unsubstantiated by factors which are properly cognizable in a zoning proceeding," Cleburne, 473 U.S. at 448, 105 S.Ct. at 3259, the military's justifications for separating members who engage in homosexual acts have roots in factors which distinguish military from civilian life and which have been recognized by the Supreme Court as properly cognizable in a military context. See, e.g., Goldman, 475 U.S. at 507, 106 S.Ct. at 1313 ("to accomplish its mission the military must foster instinctive obedience, unity, commitment, and esprit de corps").
 
 
 39
 In the same vein, Philips contends that, under Pruitt, in this circuit it is not legitimate for the government to discriminate against gay service members because other service members do not like them, and thus may react adversely to being around them. This is beside the point, however, as Pruitt came up on the pleadings, which alleged that the service member had been discharged solely on account of homosexual status, and the Army had made no attempt to justify its regulation. Here, the Navy has explained that in its judgment separating members who engage in homosexual acts is necessary to further military effectiveness by maintaining unit cohesion, accommodating personal privacy and reducing sexual tension. Although Philips faults this justification by suggesting that terms such as "good order and discipline," "privacy," and "sexual tension" cannot make prejudice proper, we cannot say that the Navy's concerns are based on "mere negative attitudes, or fear, unsubstantiated by factors which are properly cognizable" by the military. Cleburne, 473 U.S. at 448, 105 S.Ct. at 3259. Nor can we say that avoiding sexual tensions lacks any "footing in the realities" of the Naval environment in which Philips served. See Heller, 509 U.S. at 321, 113 S.Ct. at 2643.[15]
 
 
 40
 Therefore, bound by our precedent that the relationship between the Navy's mission and its policy on homosexual acts is not so attenuated as to render the distinction arbitrary and irrational, we hold that section 654(a)(1) does not violate Philips's right to equal protection. Having concluded that his discharge under the "acts" prong is constitutionally permissible, we do not consider his further challenge on equal protection grounds to the "statements" prong of the policy.
 
 IV
 
 41
 Philips contends that § 654 and the directives facially, and as applied to him, violate the First Amendment because they target the expression of a gay identity without sufficient justification. He specifically complains that § 654(b)(2), which is triggered by a "state[ment] that one is a homosexual or bisexual, or words to that effect," reaches constitutionally-protected speech, and covers expressive behavior that is likewise protected by the First Amendment. However, we agree with the district court's restraint in declining unnecessarily to reach this constitutional issue, as Philips's discharge has been upheld under § 654(b)(1). United States v. Raines, 362 U.S. 17, 21, 80 S.Ct. 519, 522-23, 4 L.Ed.2d 524 (1960); New York City Transit Auth. v. Beazer, 440 U.S. 568, 582 n. 22, 99 S.Ct. 1355, 1364 n. 22, 59 L.Ed.2d 587 (1979) (courts should follow "a policy of strict necessity in disposing of constitutional issues").
 
 
 42
 To the extent that Philips objects to use of his own statements, we have already held that use of an admission of homosexuality is not precluded by the First Amendment. Pruitt, 963 F.2d at 1164; see also High Tech Gays, 895 F.2d at 578-80. Philips was discharged because the board found that he had engaged in homosexual acts, and intended to engage in homosexual acts in the future, based on his statements to this effect. Thus, as in Pruitt, Philips's statements were used as evidence, not as the reason for discharge. We therefore hold that Philips's discharge under section 654(b)(1) does not violate his First Amendment right to free speech.
 
 
 43
 AFFIRMED.
 
 NOONAN, Circuit Judge, concurring:
 
 44
 In the name of the equality of all citizens to serve in the armed forces of the United States, Mark A. Philips asks this court to reverse his honorable discharge from the United States Navy and to restore him to his rank of Petty Officer. To do so we would have to invalidate federal law and military regulations governing the armed forces. To do so we would have to take from the President and assign to ourselves a responsibility for a supervision of military discipline unknown to the Constitution and our traditions and beyond our role as judges of the United States.
 
 
 45
 The Constitution in a special way confides the care of the military services to Congress, providing in Article I, section 8, that the Congress "shall have power ... to raise and support armies ...; to provide and maintain a navy; to make rules for the government and regulation of the land and naval forces." The Constitution in a special way rests responsibility for the military services in the President, naming him explicitly in Article II, section 2, as the "Commander in Chief of the Army and Navy of the United States."
 
 
 46
 The Constitution does not exempt the military services from its own commands, but by virtue of its special treatment of this federal activity the Constitution creates a domain full of inequalities uncharacteristic of civilian life. See Parker v. Levy, 417 U.S. 733, 743-44, 94 S.Ct. 2547, 2555-56, 41 L.Ed.2d 439 (1974). The ranks established by federal statute stand as the first and most obvious of these distinctions by which American citizens are by law distinguished in their privileges and their entitlements. See 10 U.S.C. § 741, establishing the ranks and titles of commissioned officers. Inequality is inherent in the structure of the military services.
 
 
 47
 There is a reason for the constitutional creation of this different world. On the ability of the nation to defend itself the existence of the nation depends. There is no Constitution, there are no citizens, if the nation disappears. The military foundation of the nation must be secure. To Congress the Constitution entrusts the power to make rules for its government; to the President the Constitution entrusts its command.
 
 
 48
 In theory it might be urged that the powers conferred on Congress and the President by these clauses are not in kind different from the power conferred on Congress to regulate commerce among the states or the power conferred on the President to execute the laws of the United States, neither of which powers creates a domain distinctly different as far as the federal courts are concerned. Such has not been the way the government of the military has been understood. The constitutional clauses have been understood by the courts themselves to set off a sphere of American life where the courts must tread lightly.
 
 
 49
 The rationale for this special deference is such that as a matter of logic the deference might be shown only as to combat decisions and not extended to the array of bureaucratic determinations that the vast military establishment must make, or the deference could only be required in war but not in peace. Fine lines of this sort, however, have not been drawn by the courts. In peace as in war, in the Pentagon as on the battlefield, the military services are treated as a universe distinct from the civilian world ruled by the ordinary decisions of courts. See Rostker v. Goldberg, 453 U.S. 57, 68, 101 S.Ct. 2646, 2653-54, 69 L.Ed.2d 478 (1981).
 
 
 50
 In acknowledgment of the special constitutional status of the military, the courts have drawn back from a literal application of all parts of the Constitution to military activities. Not only are the armed services a world where classes of citizens are distinguished by law, but they constitute a world in which justice is afforded on different terms than it is provided to civilian citizens. Parker, 417 U.S. at 750, 94 S.Ct. at 2559.
 
 
 51
 Before a military tribunal, a defendant's constitutional rights are not the same as before a civilian court. There is no right to a trial by a jury of one's peers. Kahn v. Anderson, 255 U.S. 1, 8-9, 41 S.Ct. 224, 225-26, 65 L.Ed. 469 (1921). The right of appeal from a criminal conviction is channelled and restricted. 28 U.S.C. § 1259 (certiorari to the Supreme Court from Court of Appeals for the Armed Forces); 10 U.S.C. § 867 (review by Court of Appeals for the Armed Forces); 10 U.S.C. § 866 (review by Court of Criminal Appeals). Habeas corpus does not exist in its full robustness. Burns v. Wilson, 346 U.S. 137, 138-40, 73 S.Ct. 1045, 1046-48, 97 L.Ed. 1508 (1953). The protections of the Fourth Amendment are limited. See Kurtz v. Moffitt, 115 U.S. 487, 504-05, 6 S.Ct. 148, 154-55, 29 L.Ed. 458 (1885); United States v. Stuckey, 10 M.J. 347, 357, 361 (C.M.A.1981); United States v. Middleton, 10 M.J. 123, 126-27 (C.M.A.1981); United States v. Jacoby, 11 C.M.A. 428, 430-31, 29 C.M.R. 244, 246-47, 1960 WL 4489 (1960); Mil.Rul.Evid. 311-317 (governing searches and seizures in armed forces proceedings). The vagueness test of the Fifth Amendment applies less strictly. Parker, 417 U.S. at 756, 94 S.Ct. at 2561-62. The remedies for racial discrimination are sharply and unpleasantly limited. Chappell v. Wallace, 462 U.S. 296, 303-05, 103 S.Ct. 2362, 2367-68, 76 L.Ed.2d 586 (1983).
 
 
 52
 The first of our liberties, the free exercise of religion, also exists in the armed services in less than its constitutional amplitude. In employing its power to raise troops, Congress has been given almost a free hand to prefer some religions over others and to exempt some citizens for religious reasons and to deny exemption or discharge from service to other citizens also appealing to the free exercise of conscience as recognized by the Constitution. E.g., Negre v. Larsen, 401 U.S. 437, 462, 91 S.Ct. 828, 842, 28 L.Ed.2d 168 (1971). Within the ranks of the military, the dress code specified by regulations has been held to trump the religious practice dictated by Orthodox Judaism, so that a man will be discharged from service if he conscientiously obeys a precept of his religion. Goldman v. Weinberger, 475 U.S. 503, 106 S.Ct. 1310, 89 L.Ed.2d 478 (1986). If one asks what empirical evidence supported the Air Force's invasion of Major Goldman's religious rights, the Supreme Court cited only the regulations requiring uniformity in all details of dress and the opinion of certain Air Force officers that such uniformity was essential to the morale of the service. Id. at 508-10, 106 S.Ct. at 1313-14. There was no demonstration in any empirical way that in fact uniformity was indispensable. The opinion of the officers--a kind of educated guess guided largely by the past practice of insisting on uniformity--formed the rational basis, in the Supreme Court's eyes, for restricting a basic liberty.
 
 
 53
 In particular, military law governing sexual behavior is different. Compare Manual for Courts-Martial, United States, 1995, Article 120, p 45e [hereinafter Manual] (maximum punishment for rape is death), with Cal.Penal Code § 264 (West 1988) (maximum punishment is 8 years imprisonment), and Wash.Rev.Code Ann. §§ 9.94A.310, 9.94A.320, & 9A.44.045 (West 1988 & Supp.1996) (maximum punishment is 23 1/3 years). See also Manual, Article 134, p 62e (maximum punishment for adultery, not a crime in either Washington or California, is one year confinement plus dishonorable discharge and forfeiture of all pay and allowances); Manual, Article 134, p 83e (maximum punishment for "fraternization" between officer and enlisted person, not a crime in the civilian context, is two years confinement plus dismissal and forfeiture of all pay and allowances).
 
 
 54
 The difficulty of substituting our experience and our hunches for the military's is particularly evident in the matter of sexual behavior. The military services attempt to govern sexual conduct in ways not undertaken in civilian life. The laws and regulations represent a good guess at what unit morale requires, but if an advocate of equality challenged their rationality, what kind of empirical case could be made in their defense? The rational justification for the various sanctions meted out for sexual offenses depends on a hunch as to which conduct is worse from a military standpoint.
 
 
 55
 The dissent in our case challenges the evidence supporting the military judgment that the challenged regulations and statute are necessary for unit morale. If precedent is any guide, that kind of reexamination of the basis for the military judgment is unwarranted. Military judgments are the product of personal military experience and past institutional experience. They are apt to include unarticulated premises and, it may be, incorporate prejudices as well as prudential observations: an institution tends to project its past practice as a necessity of its future existence. It is not the task of the judiciary to second guess when competent military officers conclude that a given practice is necessary for the good of the service. In a system honeycombed with statutory distinctions drawn on the basis of unequal ranks, it would be a major work of rationalization to justify every discrimination as rationally necessary for combat efficiency. We lack the training and the experience to do so. We lack the constitutional capacity to substitute our commands for the military's. See Solorio v. United States, 483 U.S. 435, 448, 107 S.Ct. 2924, 2931, 97 L.Ed.2d 364 (1987) ("[C]ivil courts are 'ill equipped' to establish policies regarding matters of military concern."); Rostker, 453 U.S. at 65-66, 101 S.Ct. at 2652.
 
 
 56
 The dissent urges that the end of racial segregation in the military was opposed by objections analogous to those raised by the Navy here; the dissent's implication is that in our case, as in the case of racial segregation, the objections are groundless. The analogy does not work. First, racial segregation in the military was ended not by the judiciary but by the Commander-in-Chief. Exec. Order Nos. 9,980 & 9,981, 13 Fed.Reg. 4,311-13 (1948). Second, the ending of racial segregation in the military conformed to an explicit constitutional command--the badges of slavery were removed as the Thirteenth Amendment requires. In both respects the analogy is deficient and affords neither precedent nor warrant for judicial intervention in the military in our case.
 
 
 57
 In sum, while the courts retain ultimate constitutional authority over all aspects of American life, the courts do so only in accordance with the allocation of powers effected by the Constitution. We the judges are not all-powerful, all-wise overseers. The liberties of all depend upon courts staying within the role the Constitution has allotted them. In acknowledgment of that limitation, we have recognized that Congress and the President have special responsibilities over military activities, that not every provision of the Constitution can be enforced across the board within the military, and that in the unequal military society created by statute there are distinctions and discriminations which, if supported by military opinion as to their necessity, cannot be disturbed by a judge's fiat. I therefore vote to affirm the judgment of the district court.
 
 FLETCHER, Circuit Judge, dissenting:
 
 58
 The Navy discharged Petty Officer Mark A. Philips because he said that he is gay and that he engaged in private, off-base, consensual same-sex sexual activity. Because I conclude the military's policy of differentiating between the private sexual activities of its heterosexual and homosexual service members is not rationally related to a legitimate government interest, I respectfully dissent.I.
 
 
 59
 The military's "don't ask/don't tell" policy is not directed to prohibiting public homosexual acts or sexual misconduct by gay men and lesbians. Elaborate military regulations and the Uniform Code of Military Justice ("UCMJ"), 10 U.S.C. §§ 836-940, already punish sexual misconduct such as sexual harassment, sexual assault, fraternization, and indecent exposure, and sodomy is prohibited under the UCMJ for both heterosexual and homosexual service members. 10 U.S.C. § 925. However, a simple statement that one is gay, and honest answers to questions about one's sexual activity, can mandate discharge under the policy.
 
 
 60
 Philips contends that the policy violates his right to equal protection by subjecting him to mandatory discharge for engaging in sexual acts with a man while a heterosexual man would not be discharged for engaging in the same sexual acts with a woman. He argues that the only basis for the policy is the military's desire to accommodate the biases and prejudices of heterosexual service members and that there is no legitimate reason for treating heterosexual service members differently than homosexual service members. The majority concludes that the policy is constitutional because it advances legitimate military goals. As Philips was separated for engaging in same-sex sexual activity (as well as for stating that he is gay), we must review the constitutionality of the policy as it relates to the differential treatment of same-sex sexual activity and opposite-sex sexual activity.[1]
 
 
 61
 Everyone agrees that the current policy treats homosexual service members and heterosexual service members differently. A statement by a gay service member that he is gay will result in discharge, whereas a statement by a heterosexual service member that he is heterosexual will not. A statement by a gay service member that he has had sexual relations with a member of the same sex will result in discharge, whereas a statement by a heterosexual service member that he has had sexual relations with a member of the opposite sex will not. Evidence that a service member has engaged in sexual activity with a member of the same sex will result in discharge,[2] whereas evidence that a service member has engaged in the same sexual activity with a member of the opposite sex will not. It is clear that Philips would not have been discharged had his sexual partners been women rather than men.
 
 
 62
 That homosexual and heterosexual service members are treated differently does not in itself render the policy unconstitutional. Where a law neither burdens a fundamental right nor targets a suspect class, the courts will uphold the differential classification "so long as it bears a rational relation to some legitimate end." Romer v. Evans, 517 U.S. 620, ----, 116 S.Ct. 1620, 1627, 134 L.Ed.2d 855 (1996) (applying meaningful rational-basis review to Colorado's discriminatory classification of gays and lesbians); High Tech Gays v. Defense Indus. Sec. Clearance Office, 895 F.2d 563, 574 (9th Cir.1990). While rational-basis review "is not a license for courts to judge the wisdom, fairness, or logic of legislative choices," Heller v. Doe, 509 U.S. 312, 319, 113 S.Ct. 2637, 2642, 125 L.Ed.2d 257 (1993) (quoting FCC v. Beach Communications, Inc., 508 U.S. 307, 313, 113 S.Ct. 2096, 2101, 124 L.Ed.2d 211 (1993)), neither is it an abdication of the court's responsibility to strike down arbitrary classifications.
 
 
 63
 [E]ven in the ordinary equal protection case calling for the most deferential of standards, we insist on knowing the relation between the classification adopted and the object to be attained. The search for the link between classification and objective gives substance to the Equal Protection Clause; it provides guidance and discipline for the legislature, which is entitled to know what sorts of laws it can pass; and it marks the limits of our own authority.
 
 
 64
 Romer, 517 U.S. at ----, 116 S.Ct. at 1627 (critically examining the government's proffered rationales and the relationship between means and ends). We must examine the possible justifications for the policy in light of the factual context in the record. See Cleburne v. Cleburne Living Center, 473 U.S. 432, 448, 105 S.Ct. 3249, 3258, 87 L.Ed.2d 313 (1985) ("Because in our view the record does not reveal any rational basis for believing that the Featherston home would pose any special threat to the city's legitimate interests, we affirm the judgment below insofar as it holds the ordinance invalid as applied in this case.") (emphasis added); Heller, 509 U.S. at 321, 113 S.Ct. at 2643 ("[E]ven the standard of rationality ... must find some footing in the realities of the subject addressed by the legislation."); Pruitt v. Cheney, 963 F.2d 1160, 1166 (9th Cir.1992) ("[I]n High Tech Gays, upon plaintiffs' showing of discrimination, we required the government to establish on the record that its policy had a rational basis."), cert. denied, 506 U.S. 1020, 113 S.Ct. 655, 121 L.Ed.2d 581 (1992).
 
 II.
 
 65
 In order to survive rationality review, there must be a legitimate reason why homosexual but not heterosexual conduct is barred: The majority, with circular logic, implicitly concludes only that "homosexual conduct" is prohibited in order to prohibit "homosexual conduct."[3] The primary justification proffered for the "don't ask/don't tell" policy is "unit cohesion." "Good morale," "discipline," and the ability to recruit and retain military personnel are related sub-interests. While unit cohesion is surely a legitimate government interest, the current policy simply does not further this interest in a rational and reasonably related way. There is no reason to believe that engaging in private, consensual, off-base sexual activity with a member of the same sex somehow makes one a worse soldier than engaging in the same conduct with a member of the opposite sex. Indeed, government witnesses testified that gay soldiers are as effective as heterosexual soldiers. The government has acknowledged that gay and lesbian service members are no less able to perform their duties. Thus, "unit cohesion" is not harmed by gay service members' ability to contribute to their unit.[4]
 
 
 66
 The only way, then, that "unit cohesion" could conceivably be affected by the presence of gay men and lesbians in the military is by the negative reactions of service members opposed to homosexuality. This is evident from the structure of the new prohibitions.[5] If a service member keeps his homosexual orientation secret, then he is allowed to remain in the military. However, if a service member acknowledges that he is gay, then he is a threat to "unit cohesion" and must be discharged. The only material difference in these two situations is that information regarding the service member's homosexuality has been communicated to other service members, who might react negatively to the information and threaten unit cohesion.
 
 
 67
 Even assuming that such a reaction would occur,[6] its accommodation is not a legitimate government interest. Disapproval of homosexuality on the part of heterosexual service members is an impermissible reason for discriminating against gay service members. See Romer, 517 U.S. at ---- - ----, 116 S.Ct. at 1627-29 (implicitly rejecting dissent's contention that moral disapproval of homosexuality creates a legitimate state interest justifying discrimination against homosexuals). Otherwise, discrimination against an unpopular class could always be justified by reference to the moral disapproval of the majority.
 
 
 68
 The goal of promoting "unit cohesion" is illegitimate if it is based solely on biases that cannot be tolerated under the laws. "Private biases may be outside the reach of the law, but the law cannot, directly or indirectly, give them effect." Palmore v. Sidoti, 466 U.S. 429, 433, 104 S.Ct. 1879, 1882, 80 L.Ed.2d 421 (1984).[7] "[M]ere negative attitudes ... are not permissible bases" for disfavoring a class of citizens. Cleburne, 473 U.S. at 448, 105 S.Ct. at 3259. " '[I]f the constitutional conception of 'equal protection of the laws' means anything, it must at the very least mean that a bare ... desire to harm a politically unpopular group cannot constitute a legitimate governmental interest.' " Romer, 517 U.S. at ----, 116 S.Ct. at 1628 (quoting United States Dep't of Agric. v. Moreno, 413 U.S. 528, 534, 93 S.Ct. 2821, 2826, 37 L.Ed.2d 782 (1973)). Just as the desire to accommodate other citizens' personal or religious objections to homosexuality did not suffice to uphold Amendment 2, see Romer, 517 U.S. at ----, 116 S.Ct. at 1629, the desire to protect a child from the racial prejudices of others did not provide a legitimate reason for favoring a same-race couple over an interracial couple in awarding custody of a child, see Palmore, 466 U.S. at 433, 104 S.Ct. at 1882, and the negative attitudes of property owners did not provide a legitimate justification for allowing rejection of a zoning permit for a home for mentally retarded individuals, see Cleburne, 473 U.S. at 448, 105 S.Ct. at 3258-59, the desire to accommodate the attitudes of heterosexual service members opposed to homosexuality does not provide a legitimate reason for excluding gay men and lesbians from the military.[8]
 
 
 69
 The military's "retention and recruitment," "morale," and "discipline" justifications are similarly invalid. The only way the military's exclusion of gay men and lesbians conceivably furthers "retention and recruitment" is by accommodating the attitudes of service members opposed to homosexuality who refuse to serve in the military if gay men and lesbians are permitted to serve. Similarly, the only way the military's exclusion of gay men and lesbians conceivably furthers "morale" and "discipline" is by accommodating the negative attitudes of those service members who oppose having gay men and lesbians in their ranks. These are not legitimate government interests.
 
 
 70
 The remaining justifications proffered for the exclusion of gay men and lesbians are "privacy" and "sexual tension." At oral argument, the government asserted that "privacy" refers to the military's interest in protecting the privacy of heterosexual service members, whereas "sexual tension" refers to the military's interest in avoiding sexual attraction of homosexual service members to heterosexual members.
 
 
 71
 Risk of "sexual tension" as a rationale is not reasonable. The military has no interest in regulating the private feelings and thoughts of its service members: it acknowledges that sexual orientation is a personal and private matter not subject to regulation. Further, the military's professed interest in avoiding "sexual tension" is not rationally furthered by the "don't ask/don't tell" policy. As one district court judge has stated, "[T]he military's regulations permit homosexuals to serve so long as they, in effect, remain celibate and conceal their sexual orientation. The 'sexual attractions' and 'tension' which the Federal defendants speculate will result from the presence of homosexuals will, therefore, not be curtailed under the current policy." Holmes, 920 F.Supp. at 1531. It is irrational to suggest that service members who acknowledge their homosexuality or who engage in private, off-base same-sex sexual activities will create or be subject to greater "sexual tensions" than closeted gay service members or heterosexual service members.[9] Thus, differential classification on this basis is neither rational nor legitimate.
 
 
 72
 While concerns of "privacy" have a greater surface plausibility, they too do not survive rational basis scrutiny. If by "privacy," the military means service members' desire not to associate with gay men and lesbians, this is an impermissible interest under Cleburne, Pruitt, Palmore, and Romer.[10] If by privacy, the military means keeping heterosexual service members' bodies from the gaze of gay and lesbian service members, the policy is also invalid. As in Romer, the "breadth of the [policy] is so far removed from th[is] particular justification that we find it impossible to credit" the justification. Romer, 517 U.S. at ----, 116 S.Ct. at 1629. Openly gay men and lesbians are not permitted to hold any position in the military--whether lawyer, clerk, nurse, or pilot--regardless of how far removed from being stationed in close quarters in a combat situation. And, as service members are already expected to deal with greatly reduced privacy in the military, it is difficult to believe that a concern for service members' privacy is sufficient reason for disqualifying an entire class of citizens from serving in the military.
 
 
 73
 Even crediting the justification in the abstract, it is not rationally furthered by the current policy. Under the policy, "secret" homosexuals are permitted to serve; only "open" homosexuals are not.[11] To the extent the military purports to be concerned with protecting heterosexual service members from sleeping and showering with persons who find them sexually attractive, the policy does not rationally further this interest. As one district court judge has put it,
 
 
 74
 [I]f indeed there are homosexuals who wish to peek at naked bodies, they might do so quite as readily when their orientation is a secret as when it is open. The only difference will be that heterosexuals will not know which of their servicemates are homosexuals, and heterosexuals will have reason to have a generalized suspicion of everyone in the showers, hardly a circumstance likely to increase "cohesion." To suggest to heterosexuals that the secrecy policy will "accommodate" their privacy interests is to attempt to mislead them.
 
 
 75
 Able v. United States, 880 F.Supp. 968, 978 (E.D.N.Y.1995), vacated and remanded on other grounds, 88 F.3d 1280 (2nd Cir.1996); accord Holmes, 920 F.Supp. at 1531. Similarly, the fact that a service member has engaged in private, off-base, same-sex sexual activity in no way makes him more of a "threat" to heterosexual service members' privacy than a service member with a secret homosexual "orientation"--he is no more likely to stare at heterosexual service members' naked bodies or be attracted to them. While the policy need not be perfectly tailored to the asserted government interest to withstand constitutional scrutiny, there must be some rational basis for distinguishing between the disfavored and favored classes. Here, there is none. Accord Holmes, 920 F.Supp. at 1531.
 
 III.
 
 76
 The majority relies heavily upon our prior cases upholding challenges to military policies discharging service members who engage in sexual relations with members of the same sex for support of its holding that the current policy does not violate the Equal Protection Clause. While these cases are instructive, they must be analyzed discretely as to their effect on the constitutionality of the new policy. In addition to being undercut by subsequent Supreme Court decisions holding that accommodation of individuals' disapproval of an unpopular group on moral or religious grounds or bias of any kind does not constitute a legitimate government interest, see Romer, 517 U.S. at ----, 116 S.Ct. at 1628; Cleburne, 473 U.S. at 448, 105 S.Ct. at 3258-59; Palmore, 466 U.S. at 433, 104 S.Ct. at 1882, these earlier cases are premised on different policy justifications and definitions of proscribed conduct than those that underlie the current policy. These cases are founded in large part on acceptance of the military's justification of avoiding tension "between known homosexuals and other members who 'despise/detest homosexuality.' " See Pruitt, 963 F.2d at 1163 (quoting Beller v. Middendorf, 632 F.2d 788, 811 (9th Cir.1980), cert. denied, 452 U.S. 905, 101 S.Ct. 3030, 69 L.Ed.2d 405 (1981)). As explained above, Romer, Palmore, and Cleburne undercut this rationale, holding that accommodation of the biases of others is not a legitimate government interest.
 
 
 77
 Hatheway and Schowengerdt[12] rely on Beller[13] for the proposition that the military has a legitimate interest in discharging those who engage in homosexual acts in order to avoid tension between gay and lesbian service members and other members who "despise/detest homosexuality." Beller, 632 F.2d at 811. As such, the reasoning of each of these cases is undercut by subsequent holdings in Romer, Cleburne, and Palmore. Cf. Pruitt, 963 F.2d at 1165 (noting that Beller and Hatheway cannot be given unexamined effect after Palmore and Cleburne ). Meinhold, similarly, merely cites Beller, Hatheway, and Schowengerdt for the proposition that the military can discharge a service member for homosexual conduct. 34 F.3d at 1477, n. 7. To the extent Meinhold distinguishes between disapproval of homosexual "status" and disapproval of homosexual "conduct," its reasoning is similarly unavailing post-Romer.
 
 IV.
 
 78
 Finally, that the purported justifications arise in the military context does not endow them with greater legitimacy. Although Romer, Cleburne, and Palmore arose in the civilian context, I cannot accept Judge Noonan's proposition that the desire to accommodate animosity towards a disfavored group is more acceptable in the military context than in the civilian context. See supra (Noonan, J., concurring). Judge Noonan puts the Constitution in his hip pocket and brushes its commands aside when he says that "not every provision of the Constitution can be enforced across the board within the military." Supra at 1432 (Noonan, J., concurring).
 
 
 79
 As courts and commentators have noted, the "unit cohesion" rationale proffered in support of the "don't ask/don't tell" policy is disturbingly similar to the arguments used by the military to justify the exclusion from and segregation of African Americans in military service. "For much of our history, the military's fear of racial tension kept black soldiers separated from whites. As recently as World War II both the Army Chief of Staff and the Secretary of the Navy justified racial segregation in the ranks as necessary to maintain efficiency, discipline, and morale." Watkins, 875 F.2d at 729 (Norris, J., concurring); see also Thomasson, 80 F.3d at 950 (Hall, J., dissenting); Holmes, 920 F.Supp. at 1533; Kenneth L. Karst, The Pursuit of Manhood and the Desegregation of the Armed Forces, 38 UCLA L.Rev. 499, 572-74 (1991) (noting parallels between arguments made in support of the segregation and exclusion of African Americans from the military and in support of the exclusion of gay men and lesbians). Despite the deference due the military, there is no doubt that were the government today to exclude African-Americans from the military, the courts would easily reject the military's assertions of "unit cohesion," "morale," and "discipline" and strike down the policy as violative of equal protection. While racial classifications are subject to a stricter level of scrutiny, these asserted interests, which are based on animosity towards the disfavored class, are no more acceptable when used to support the exclusion of gay men and lesbians from the military.
 
 
 80
 The dangers of unquestioning deference to the military are demonstrated by decisions such as Korematsu v. United States, 323 U.S. 214, 65 S.Ct. 193, 89 L.Ed. 194 (1944), which upheld the internment of Japanese Americans during World War II against constitutional challenge. As commentators and courts have noted, "[t]hat decision, justified by deference to the military's race-based judgment about the threat posed by Japanese Americans, is one of the Court's most embarrassing moments, and has been thoroughly repudiated by history." David Cole & William N. Eskridge, Jr., From Hand-Holding to Sodomy: First Amendment Protection of Homosexual (Expressive) Conduct, 29 Harv.C.R.-C.L.L.Rev. 319, 343 (1994). These inexcusable moments in our history should give us pause whenever deference to the military is urged in support of discrimination against a class of citizens.
 
 
 81
 Judge Noonan states explicitly what the majority holds implicitly--that "[w]e lack the constitutional capacity to substitute our commands for the military's." Supra at 1432 (Noonan, J., concurring). Although claiming only 'deference' to the military, he ultimately negates our ability to review any military decision despite its constitutional infirmity: "It is not the task of the judiciary to second guess when competent military officers conclude that a given practice is necessary for the good of the service." Id. However, the military is not above the constitution. See Parisi v. Davidson, 405 U.S. 34, 55, 92 S.Ct. 815, 826-27, 31 L.Ed.2d 17 (1971) ("When the military steps over [the] bounds [of civil liberties], it leaves the area of its expertise and forsakes its domain. The matter then becomes one for civilian courts to resolve, consistent with the statutes and with the Constitution.") (Douglas, J., concurring) (citations omitted). While "judicial deference ... is at its apogee when legislative action under the congressional authority to raise and support armies and make rules and regulations for their governance is challenged," Goldman v. Weinberger, 475 U.S. 503, 508, 106 S.Ct. 1310, 1313, 89 L.Ed.2d 478 (1986) (quoting Rostker v. Goldberg, 453 U.S. 57, 70, 101 S.Ct. 2646, 2655, 69 L.Ed.2d 478 (1981)), "[w]e of course do not abdicate our ultimate responsibility to decide the constitutional question." Rostker, 453 U.S. at 67, 101 S.Ct. at 2653.
 
 
 82
 If not for the military context, there is no doubt that Philips' discharge pursuant to the "don't ask/don't tell" policy would violate equal protection. Even taking into account the unique military context, I see no legitimate government interest that the policy rationally furthers. Gay men and lesbians are no less able and no more prone to misconduct than their heterosexual counterparts. There is nothing about engaging in private, off-base, same-sex conduct that harms the military more than engaging in private, off-base, opposite-sex conduct. The only conceivable rationales for the exclusionary policy--unit cohesion, morale, and privacy--are dependent not on the capabilities of gay men and lesbians as service members but on the negative reactions of other service members. Even in the military context, an entire class may not be singled out for disfavored treatment because of animosities towards that class.
 
 
 83
 While certain internal military matters are totally exempt from judicial review, the military does not contend that the "don't ask/don't tell policy" is such a matter. Indeed, the validity of regulations similar to those before us were reviewed by our court in Meinhold, Pruitt, and Beller. Thus, "deference" to the military cannot mean that we may not subject the "don't ask/don't tell" policy to meaningful judicial review. Deference does not mean unquestioningly accepting the military's asserted justifications.[14] Judicial deference to the military simply means sensitivity to the special circumstances of the military and appropriate respect for their particular role as our protectors, not abdication of our role as adjudicators of constitutional claims. See Knutson v. Wisconsin Air National Guard, 995 F.2d 765, 769 (7th Cir.1993). In Goldman, the controlling concurrence of Justice Stevens deferred to the military's interest in uniformity of dress precisely because the rule at issue was "based on a neutral, completely objective standard" and was "not motivated by hostility against" any particular group, however defined. 475 U.S. at 513, 106 S.Ct. at 1316. The same cannot be said here.
 
 
 84
 "Inequality is inherent in the structure of the military services." Supra at 1430 (Noonan, J., concurring). I agree that there are ranks and privileges attendant upon them, but that does not mean that the military may allow unequal access to those ranks without a permissible rational basis for doing so. Military regulations cannot provide, for example, that only white males can aspire to ranks above captain in the Army or Air Force or lieutenant in the Navy. The military now concedes that competence of homosexuals is not an issue and that aptitude for military service is not an issue. It concedes equivalence with heterosexuals on all tests and scales that matter. By the military's own regulations closeted homosexuals are not disqualified from service. Why may acknowledged or practicing homosexuals not serve? Only because some heterosexuals may harbor prejudices against them.
 
 
 85
 The military has carved out a particular class and subjected it to adversely discriminatory treatment. The "don't ask/don't tell" policy "inflicts on [gay men and lesbians] immediate, continuing, and real injuries that outrun and belie any legitimate justifications that may be claimed for it." Romer, 517 U.S. at ----, 116 S.Ct. at 1629. The policy, pursuant to which Philips, an exemplary public servant, was discharged, violates equal protection. Philips' service record illustrates the irrationality of the policy. I respectfully dissent.
 
 
 
 [1]
 The President announced his "Policy on Homosexual Conduct in the Armed Forces" July 19, 1993, and its main points were codified in legislation enacted November 30, 1993. 10 U.S.C. § 654 (Supp.1994). Final implementing directives were issued by the Department of Defense (DOD) and the Navy February 28, 1994. See DOD Directive 1332.14 (March 4, 1994); NAVADMIN 033/94. As the Navy regulations are essentially identical to DOD Directive 1332.14, we shall refer only to the DOD Directive; and as the Directive simply implements the policy of the statute in nearly identical terms, we refer interchangeably to § 654, the directives and the policy
 
 
 [2]
 The district court's opinion is published. Philips v. Perry, 883 F.Supp. 539 (W.D.Wash.1995)
 
 
 [3]
 DOD Directive 1332.14 (Jan. 28, 1982), published at 32 C.F.R. Pt. 41, App. A
 
 
 [4]
 The board further found that Philips had not demonstrated all of the following: (1) that such acts are a departure from his usual and customary behavior; (2) that such acts, under all the circumstances, are unlikely to recur; (3) that such acts were not accomplished by use of force, coercion, or intimidation; (4) that under the particular circumstances of the case, his continued presence in the Navy would be consistent with the interests of the Navy in proper discipline, good order, and morale; and (5) that he does not have a propensity or intent to engage in homosexual acts. See 10 U.S.C. § 654(b)(1)
 
 
 [5]
 In this regard the board found that Philips failed to demonstrate that he is not a person who engages in, attempts to engage in, has a propensity to engage in, or intends to engage in homosexual acts. See 10 U.S.C. § 654(b)(2)
 
 
 [6]
 The district also rejected Philips's substantive due process challenge, holding that it was foreclosed by our decision in Beller. Philips does not appeal this holding
 
 
 [7]
 Philips's appeal is supported by amici curiae the Human Rights Campaign, Union of American Hebrew Congregations, American Jewish Congress, United Church of Christ Office for Church in Society, National Organization for Women, NOW Legal Defense and Education Fund, Center for Women Policy Studies, National Gay and Lesbian Task Force, and Gay and Lesbian Advocates and Defenders. The Family Research Council filed a brief supporting the Secretary's position
 
 
 [8]
 Section 654(b) provides in full:
 (B) Policy.--A member of the armed forces shall be separated from the armed forces under regulations prescribed by the Secretary of Defense if one or more of the following findings is made and approved in accordance with procedures set forth in such regulations:
 (1) That the member has engaged in, attempted to engage in, or solicited another to engage in a homosexual act or acts unless there are further findings, made and approved in accordance with procedures set forth in such regulations, that the member has demonstrated that--
 (A) such conduct is a departure from the member's usual and customary behavior;
 (B) such conduct, under all the circumstances, is unlikely to recur;
 (C) such conduct was not accomplished by use of force, coercion, or intimidation;
 (D) under the particular circumstances of the case, the member's continued presence in the armed forces is consistent with the interests of the armed forces in proper discipline, good order, and morale; and
 (E) the member does not have a propensity or intent to engage in homosexual acts.
 (2) That the member has stated that he or she is a homosexual or bisexual, or words to that effect, unless there is a further finding, made and approved in accordance with procedures set forth in the regulations, that the member has demonstrated that he or she is not a person who engages in, attempts to engage in, has a propensity to engage in, or intends to engage in homosexual acts.
 (3) The member has married or attempted to marry a person known to be of the same biological sex.
 
 
 [9]
 The policy definitions provide in relevant part that:
 (1) The term "homosexual" means a person, regardless of sex, who engages in, attempts to engage in, has a propensity to engage in, or intends to engage in homosexual acts, and includes the terms "gay" and "lesbian".
 ...
 (3) The term "homosexual act" means--
 (A) any bodily contact, actively undertaken or passively permitted, between members of the same sex for the purpose of satisfying sexual desires; and
 (B) any bodily contact which a reasonable person would understand to demonstrate a propensity or intent to engage in an act described in subparagraph (A).
 10 U.S.C. § 654(f)(1), (3).
 
 
 [10]
 The Directive provides for discharge for homosexual conduct on the basis of a statement when findings are made that "the member has made a statement that he or she is a homosexual or bisexual, or words to that effect, unless there is a further approved finding that the member has demonstrated that he or she is not a person who engages in, attempts to engage in, has a propensity to engage in, or intends to engage in homosexual acts." Such a statement creates a rebuttable presumption. The regulation further states that:
 Propensity to engage in homosexual acts means more than an abstract preference or desire to engage in homosexual acts; it indicates a likelihood that a person engages in or will engage in homosexual acts. In determining whether a member has successfully rebutted the presumption that he or she engages in, attempts to engage in, or has a propensity or intent to engage in homosexual acts, some or all of the following may be considered:
 (a) Whether the member has engaged in homosexual acts;
 (b) The member's credibility;
 (c) Testimony from others about the member's past conduct, character, and credibility;
 (d) The nature and circumstances of the member's statement;
 (e) Any other evidence relevant to whether the member is likely to engage in homosexual acts.
 DOD Directive 1332.14(H)(1)(b)(2).
 
 
 [11]
 High Tech Gays, 895 F.2d at 572 (Bowers v. Hardwick, 478 U.S. 186, 194-96, 106 S.Ct. 2841, 2846-47, 92 L.Ed.2d 140 (1986), overruled Beller on the need for heightened scrutiny)
 
 
 [12]
 Every other circuit to address this issue is in accord, upholding against constitutional challenges the authority of the military to discharge those members who engage in homosexual conduct. See, e.g., Dronenburg v. Zech, 741 F.2d 1388, 1398 (D.C.Cir.1984) (relying on Beller and holding that "the policy requiring discharge for homosexual conduct is a rational means of achieving the[ ] legitimate interests [in maintaining discipline, good order, and morale]"); Rich v. Secretary of Army, 735 F.2d 1220, 1229 (10th Cir.1984) (relying on both Beller and Hatheway to conclude that "[a] classification based on one's choice of sexual partners ... is valid in light of the Army's demonstration of a compelling governmental interest in maintaining the discipline and morale of the armed forces"); Falk v. Secretary of the Army, 870 F.2d 941, 947 (2d Cir.1989) (relying on Beller in refusing to overturn the Army's decision to "retain[ ] homosexual conduct as the reason given for [Falk's] discharge"); Woodward v. United States, 871 F.2d 1068, 1076-77 (Fed.Cir.1989) (relying on Beller to reject equal protection challenge), cert. denied, 494 U.S. 1003, 110 S.Ct. 1295, 108 L.Ed.2d 473 (1990); Walmer v. United States Dep't of Defense, 52 F.3d 851, 854-55 (10th Cir.), cert. denied, --- U.S. ----, 116 S.Ct. 474, 133 L.Ed.2d 403 (1995). Moreover, the Fourth Circuit's recent en banc decision in Thomasson v. Perry, 80 F.3d 915 (4th Cir.), cert. denied, --- U.S. ----, 117 S.Ct. 358, 136 L.Ed.2d 250 (1996), which upheld the "statements" prong of the policy against an equal protection challenge, was based in part on the court's conclusion that "military authorities may discharge those who engage in homosexual acts," and that "it is legitimate for Congress to proscribe homosexual acts." Id. at 929
 
 
 [13]
 See Beller, 632 F.2d at 811 & n. 22, quoting in part an affidavit from the Assistant Chief of Naval Personnel identifying such tension as one of a number of reasons for the Navy's then-current policy on homosexuality
 
 
 [14]
 In its post-Palmore en banc opinion upholding the Naval Academy's discharge of a midshipman who admitted his homosexual orientation, the District of Columbia Circuit cited Beller with approval on this point: "the military may constitutionally terminate service of all those who engage in homosexual conduct--wherever it occurs and at whatever time the conduct takes place." Steffan v. Perry, 41 F.3d 677, 685 (D.C.Cir.1994). Judge Wald in dissent also recognized the significance of the distinction between discharging members for engaging in homosexual conduct and discharging them merely for stating a homosexual orientation. Id. at 710 ("[t]he military itself recognizes a fundamental distinction between homosexual orientation and homosexual conduct"); id. at 711 ("[t]he most recent [military] policy ... explicitly acknowledges the distinction between homosexual status and homosexual conduct"); id. at 712 ("homosexual orientation and conduct are analytically distinct concepts") (Wald, J., dissenting). The Federal Circuit's post-Cleburne decision in Woodward also relied on Beller to uphold the Navy's authority to discharge members who engage in homosexual conduct. Woodward, 871 F.2d at 1076-77
 
 
 [15]
 As then-Chairman of the Joint Chiefs of Staff, General Colin L. Powell, explained during his congressional testimony, "the majority of our young men and women are required to live in communal settings that force intimacy and provide little privacy. It may be hard to contemplate spending 60 days in the close confines of a submarine; sleeping in a foxhole with half a dozen other people; 125 people all living and sleeping in the same 40 by 50 foot, open berthing area, but this is exactly what we ask our young people to do." S.Rep. No. 112, 103d Cong., 1st. Sess. 277 (1993)
 
 
 [1]
 Because Philips was discharged for engaging in "homosexual acts" within the meaning of the statute, I use the terms "homosexual," "gay," and "lesbian" to refer to individuals who engage in same-sex sexual activity. I note, however, that identifying oneself as gay or lesbian need not involve sexual activity. "Gay," "lesbian," and "homosexual" can refer to an individual's sexual and emotional attraction to members of the same sex regardless of sexual activity. That the policy treats same-sex conduct differently depending on whether or not an individual has a "propensity" to engage in homosexual conduct, 10 U.S.C. § 654(b)(1)(E), suggests that the military's concern is with gay and lesbian identity rather than specific sexual acts. Although the military purports to be concerned only with homosexual conduct, even a service member's statement that he is gay requires discharge unless the service member can "demonstrate that he or she is not a homosexual as defined in the statute." S. Rpt. No. 103-112, at 294. "[A] member cannot rebut the presumption simply through a promise to adhere to military standards of conduct in the future; nor can the member rebut the presumption by a statement to the effect that he or she has a propensity towards homosexuality but has not acted on it." Id
 
 
 [2]
 In the foregoing situations, a service member who states that he is gay or who engages in same-sex acts may avoid discharge only if he can demonstrate, among other things, that despite his statements or acts, he does not have a "propensity" to engage in homosexual acts. 10 U.S.C. § 654(b)(1)(E) & (2). Thus, presumably, if a service member can demonstrate that he was only joking about being gay, or that he is really heterosexual despite a one-time same-sex encounter, he can avoid discharge. Of course, such a means of rebutting the presumption is of little comfort to a service member who is in fact gay. For the reasons discussed infra that the military's discrimination against service members on the basis of "homosexual acts" cannot survive equal protection scrutiny, neither can the military's discrimination on the basis of "homosexual propensity" survive equal protection scrutiny
 
 
 [3]
 As sodomy and sexual misconduct are already prohibited by the UCMJ for both heterosexual and homosexual service members, and as the government acknowledges that homosexual service members are no more likely to engage in sexual misconduct than heterosexual service members, "homosexual conduct" cannot be used as proxy for sexual misconduct and the policy cannot rationally be justified as a way of deterring sexual misconduct. The Romer Court implicitly but necessarily rejected the argument that discrimination on the basis of homosexuality does not violate equal protection simply because Bowers v. Hardwick has held that the criminalization of homosexual sodomy does not offend due process. Romer, 517 U.S. at ---- - ----, 116 S.Ct. at 1627-29; id. at ----, 116 S.Ct. at 1629 (Scalia, J., dissenting) (criticizing the majority for this reason); see also Watkins v. United States Army, 875 F.2d 699, 716-20 (9th Cir.1989) (en banc) (Norris, J., concurring) (rejecting the Army's argument that Bowers v. Hardwick forecloses a gay service member's equal protection claim), cert. denied, 498 U.S. 957, 111 S.Ct. 384, 112 L.Ed.2d 395 (1990); Cass R. Sunstein, Sexual Orientation and the Constitution: A Note on the Relationship Between Due Process and Equal Protection, 55 U. Chi. L.Rev. 1161, 1162 n. 9 (1988) (Because Hardwick involved due process rather than equal protection, "Watkins can be distinguished from Hardwick even if the former decision were to be applied to a class of people including some, many, or all who engage in the conduct at issue in Hardwick."). Likewise, the Romer Court declined to exclude gay men and lesbians who engage in same-sex sexual relations from the protection of its ruling. The opinion did not differentiate between men and women who merely had a "homosexual orientation" and those who engaged in "homosexual conduct;" indeed, it struck down in its entirety Amendment 2, which encompassed both "homosexual ... orientation [and] conduct." Romer, 517 U.S. at ----, 116 S.Ct. at 1623. Thus, although the majority relies on our prior cases which found no violation of equal protection because the underlying conduct could be regulated under the Due Process Clause, see Hatheway v. Secretary of the Army, 641 F.2d 1376, 1382 (9th Cir.1981), cert. denied, 454 U.S. 864, 102 S.Ct. 324, 70 L.Ed.2d 164 (1981), or assumed that the military could disfavor those who engaged in "homosexual conduct" even though it could not disfavor individuals with a "homosexual orientation," see Meinhold v. U.S. Dep't of Defense, 34 F.3d 1469, 1477 (9th Cir.1994), these cases have been undercut by Romer. See supra Section III
 
 
 [4]
 In Philips' Commanding Officer's Recommendation for Administrative Separation by Reason of Homosexual Conduct as Evidenced by His Statement directed to the Chief of Personnel, he stated:
 In support of the Department of Defense current policy regarding administrative separations based on homosexuality, I concur with the recommendations of the administrative separation board and recommend Petty Officer Philips for an Honorable discharge.
 Since reporting on board TPU Puget Sound in December 1992 for administrative processing, Petty Officer Philips has consistently proven to be a 4.0 Sailor. Always willing to accept additional responsibilities, he has excelled at every endeavor.
 Even though his future in the military has been uncertain since December 1992, he has continued to serve the Navy to the utmost of his ability and performed remarkably well.
 If ever DOD policy changes and Petty Officer Philips is called back to active duty, I have utmost confidence that he will have a highly productive career and serve the Navy with pride and professionalism.
 
 
 [5]
 It is also evident from the legislative history of the statute. Witnesses testified that "the question of open versus closeted behavior is the key here. I agree that open homosexuality works against unit cohesion," S. Hrg. No. 103-845, at 730 (emphasis added); "the introduction of an open homosexual into a small unit immediately polarizes that unit," S. Rpt. No. 103-112, at 280 (emphasis added); "the presence of open homosexuality would have an unacceptable detrimental and disruptive impact." Id. at 278 (emphasis added). Such an effect could stem only from the negative reactions of service members prejudiced against homosexuals
 
 
 [6]
 That such a reaction would in fact occur is far from certain. The ability of service members to put duty before prejudice has been tested before. When President Truman integrated the armed forces in 1948, he did so despite widespread opposition from the military and even greater opposition from society than the current opposition to allowing gay men and lesbians in the military. See Holmes v. California Army Nat'l Guard, 920 F.Supp. 1510, 1533 (N.D.Cal.1996); Watkins, 875 F.2d at 729 n. 32 (Norris, J., concurring); RAND's National Defense Research Institute, Sexual Orientation and U.S. Military Personnel Policy: Options and Assessment 22 (1993) (hereinafter "RAND Study"). Although " '[d]ire consequences were predicted for maintaining discipline, building group morale, and achieving military organization goals, ... [n]one of these predictions has come true.' " Dahl v. Secretary of U.S. Navy, 830 F.Supp. 1319, 1330 (E.D.Cal.1993) (quoting a 1988 study commissioned by the DOD concerning gays in the military). The RAND study, which was prepared for the DOD, concludes that the experience of integrating the military indicates that "civilian and military leadership can effectively overcome the initial resistance to change and can minimize the worst fears of opponents about the damaging effects on unit performance." RAND Study at 22. The experience of countries that permit gay men and lesbians to serve in the military also supports the conclusion that unit performance would not be adversely affected. RAND Study at 15 ("None of the militaries studied for this report believe their effectiveness as an organization has been impaired or reduced as a result of the inclusion of homosexuals."). Similarly, United States fire and police departments visited by RAND researchers "report that, overall, the effectiveness of the organization has not been diminished by the presence of homosexuals on the force." RAND Study at 19. And, despite the military's fear of unit breakdown, many gay service members have been accepted and supported by their units. Cf. Richard Posner, Sex and Reason 319 (1992) ("The most important reason for doubting that dropping the ban on homosexuals in the military would cause serious morale problems is simply that a large number of homosexuals already serve without significant difficulties."). For these reasons, the evidence that unit cohesion would be harmed by the inclusion of gay men and lesbians is weak. However, even if true the military's judgment that unit cohesion would be harmed, the only way that unit cohesion would be harmed is through the unit's animosity towards gay men and lesbians. A justification that rests on prejudice and hatred of others is illegitimate
 
 
 [7]
 Although the racial classifications in Palmore were subject to strict scrutiny, Cleburne holds that accommodating the private biases of others is equally invalid under rational basis review. 473 U.S. at 448, 105 S.Ct. at 3258-59
 
 
 [8]
 Although the Fourth Circuit has accepted the military's assertions that unit discipline and solidarity justify the policy, Thomasson v. Perry, 80 F.3d 915, 929 (4th Cir.1996) (en banc), cert. denied, --- U.S. ----, 117 S.Ct. 358, 136 L.Ed.2d 250 (1996), the dissent in that case has much the better of the argument: the military's assertion of "unit cohesion" is merely another name for accommodating animosity towards gay men and lesbians. See id. at 951 (Hall, J., dissenting). " 'Unit cohesion' is a facile way for the ins to put a patina of rationality on their efforts to exclude the outs." Id. at 952 (Hall, J., dissenting)
 
 
 [9]
 Sexual relationships between heterosexual service members of the same rank are permitted; such relationships seem to provide more potential for "sexual tension" than same-sex relationships between a homosexual service member and a non-service member. Indeed, heterosexual sexual harassment in the military is a serious and widely prevalent problem. According to a GAO survey, in 1991 between 93-97% of women in military academies experienced some form of sexual harassment. GAO, DOD Service Academies: More Actions Needed to Eliminate Sexual Harassment 3 (January 31, 1994). This again points up the irrationality of the current policy
 
 
 [10]
 The government's arguments disturbingly parallel the arguments put forth in opposition to the proposed racial integration of the military in the 1940s: "Men on board ship live in particularly close association; in their messes, one man sits beside another; their hammocks or bunks are close together.... How many white men would choose, of their own accord, that their closest associates in sleeping quarters, at mess, and in a gun's crew should be of another race? ... The General Board believes that the answer is 'Few, if any.' " Thomasson, 80 F.3d at 952 (Hall, J., dissenting) (quoting committee that studied the proposed racial integration of the Navy)
 
 
 [11]
 The majority in Thomasson does not accept this characterization of the policy, reasoning that the military's failure to ask recruits whether or not they are gay is simply a matter of conserving scarce resources. However, this conclusion contradicts the explicit terms of the policy. The policy officially acknowledges that "sexual orientation" is not a bar to military service. DOD Directive 1332.14(H)(1)(a) (1994); NAVADMIN 033/94, at 3; S. Hrg. No. 103-845, at 702. Thus, a service member who considers himself gay but tells no one is allowed in the military; it is not simply that the military has failed to catch him. However, a service member who tells the military that he is gay is subject to discharge. 10 U.S.C. § 654(b)(2)
 
 
 [12]
 Schowengerdt v. United States, 944 F.2d 483 (9th Cir.1991), cert. denied, 503 U.S. 951, 112 S.Ct. 1514, 117 L.Ed.2d 650 (1992). In that case, we also noted that we were not addressing an equal protection objection to the policy, which "is not the same as a substantive due process objection." Id. at 490 n. 8. Here, of course, we are addressing an equal protection challenge
 
 
 [13]
 Beller also appears to be based, in part, on acceptance of the military's assertions that "[a] homosexual might force his desires upon others" and "[h]omosexuals may be less productive/effective than their heterosexual counterparts...." 632 F.2d at 811 n. 22. As the military has now acknowledged, gay service members are no more prone to misconduct or less effective than their heterosexual counterparts. Accordingly, these assertions were not offered as rationale for the current policy
 
 
 [14]
 The Supreme Court has reviewed numerous constitutional claims against the military. See, e.g., Goldman v. Weinberger, 475 U.S. 503, 106 S.Ct. 1310, 89 L.Ed.2d 478 (1986) (first amendment challenge to Air Force dress code); Rostker v. Goldberg, 453 U.S. 57, 101 S.Ct. 2646, 69 L.Ed.2d 478 (1981) (equal protection challenge to male-only draft registration); Brown v. Glines, 444 U.S. 348, 100 S.Ct. 594, 62 L.Ed.2d 540 (1980) (first amendment challenge to Air Force regulation regarding circulation of petitions); Frontiero v. Richardson, 411 U.S. 677, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973) (equal protection challenge to military benefits statutes which discriminated against women)