124 F.3d 1126
 71 Empl. Prac. Dec. P 45,000, 97 Cal. Daily
Op. Serv. 7165,
97 Daily Journal D.A.R. 11,571
Andrew HOLMES, First Lieutenant, Plaintiff-Appellee,
v.
CALIFORNIA ARMY NATIONAL GUARD; Tandy Bozeman, Major, in
his official capacity; Pete Wilson, Governor, in
his official capacity, Defendants-Appellants.
Andrew HOLMES, First Lieutenant, Plaintiff-Appellee,
v.
CALIFORNIA ARMY NATIONAL GUARD; Tandy Bozeman, Major, in
his official capacity; Pete Wilson, Governor, in his
official capacity; U.S. Army National Guard; United States
of America; William S. Cohen, Secretary of Defense,
Defendants-Appellants.
Richard P. WATSON, Lieutenant, Plaintiff-Appellant,
v.
William S. COHEN, Secretary of Defense; John Dalton,
Secretary of the Navy; United States of America,
Defendants-Appellees.
 Nos. 96-15855, 96-15726 and 96-35314.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted July 8, 1996.
Submission vacated Aug. 16, 1996.
Resubmitted April 7, 1997.
Decided Sept. 5, 1997.
 
 Christopher J. Bakes, Douglas G. Chapman III, Bakes & Chapman, San Francisco, CA, for appellant Watson.
 Kim M. Settles, Deputy Attorney General, Oakland, CA, for State appellants in Holmes.
 E. Roy Hawkens, Attorney, United States Department of Justice, Washington, DC, for Federal appellants in Holmes and the appellees in Watson.
 Todd E. Thompson and L. Jay Kuo, Howard, Rice, Nemerovski, Canady, Falk & Rabkin, San Francisco, CA, for appellee Holmes.
 Melissa Wells-Petry, Washington, DC, for amicus curiae Family Research Council.
 Karen M. McGaffey, Bogle & Gates P.L.L.C., Seattle, WA, for amicus curiae Northwest Women's Law Center and Kirk Childress, Servicemembers Legal Defense Network, Washington, DC, for amicus curiae Servicemembers Legal Defense Network.
 Appeals from the United States District Court for the Northern District of California; Saundra B. Armstrong, District Judge, Presiding. D.C. No. CV-95-00688-SBA.
 Appeal from the United States District Court for the Western District of Washington; Thomas S. Zilly, District Judge, Presiding. D.C. No. CV-95-01141-TSZ.
 Before: REAVLEY,* REINHARDT, and WIGGINS, Circuit Judges.
 Opinion by Judge WIGGINS; Dissent by Judge REINHARDT.
 WIGGINS, Circuit Judge:
 
 
 1
 We review the constitutional challenges of two service members to the military's current "don't ask/don't tell" policy on homosexuals.[1] Pursuant to the policy, Lieutenant Richard P. Watson was discharged from the United States Navy and First Lieutenant Charles Andrew Holmes was discharged from the California Army National Guard ("CANG") and the United States Army National Guard ("USANG"). With respect to Watson, the district court granted summary judgment in favor of the Navy, holding that his discharge was essentially based on homosexual conduct and, therefore, the "don't ask/don't tell" policy was constitutional as it applied to him. Watson v. Perry, 918 F.Supp. 1403 (W.D.Wash.1996). With respect to Holmes, the district court granted summary judgment in Holmes's favor as to his claims for violation of his constitutional rights to equal protection and free speech, holding that his discharge was unconstitutional because it was based solely on his statement that he is homosexual. Holmes v. California Army Nat'l Guard, 920 F.Supp. 1510 (N.D.Cal.1996).
 
 
 2
 Watson and the defendants in Holmes appeal the respective district court orders, addressing the constitutionality of 10 U.S.C. § 654(b)(2) and its implementing regulations.[2] We have jurisdiction under 28 U.S.C. § 1291. On our own motion, we consolidated the appeals. Because we conclude that § 654(b)(2) and its implementing regulations are constitutionally valid, we affirm the district court in Watson and reverse in Holmes.
 
 BACKGROUND
 The "Don't Ask/Don't Tell" Policy
 
 3
 The present policy regarding homosexuals in the military, commonly known as the "don't ask/don't tell" policy, is the product of extensive deliberation by Congress and the President. When it enacted the policy, Congress made a series of legislative findings, including the following: (1) that military life is fundamentally different from civilian life in that military society is characterized by numerous restrictions on personal behavior that would not be acceptable in civilian society, 10 U.S.C. § 654(a)(8)(B); (2) that standards of conduct for members of the armed forces must apply at all times to members whether on or off base and whether on or off duty, id. § 654(a)(10); (3) that the potential duties of the armed forces make it necessary for members of the armed forces to accept involuntarily living conditions characterized by forced intimacy with little or no privacy, id. § 654(a)(12); (4) that "[t]he prohibition against homosexual conduct is a longstanding element of military law that continues to be necessary in the unique circumstances of military service," id. § 654(a)(13); and (5) that "[t]he presence in the armed forces of persons who demonstrate a propensity or intent to engage in homosexual acts would create an unacceptable risk to the high standards of morale, good order and discipline, and unit cohesion that are the essence of military capability," id. § 654(a)(15).
 
 
 4
 The "don't ask/don't tell" policy differs from the military's former policy on homosexuals in that the statement, "homosexuality is incompatible with military service," was eliminated. See DOD Directive 1332.14, 32 C.F.R. pt. 41, App. A at 93 (1981) ("old policy"). As a result, the military no longer asks new recruits questions about their sexual orientation. Also unlike the old regulatory policy, the regulations implementing the new policy stipulate that sexual orientation is considered a personal and private matter, and does not bar entry into service or continued service, unless manifested by homosexual conduct. DOD Directive 1332.30 at 2-1(C). However, the "don't ask/don't tell" policy continues to require discharge of any service member (1) who engages in or intends to engage in homosexual acts, see 10 U.S.C. § 654(b)(1); DOD Directive 1332.30 at 2-2(C)(1)(a) (hereinafter "acts prong"); (2) who makes a statement that he is homosexual and fails to rebut the presumption, raised by that statement, that he has a propensity to engage in homosexual acts, see 10 U.S.C. § 654(b)(2); DOD Directive 1332.30 at 2-2(C)(1)(b) (hereinafter "statement prong"); or (3) who has married or attempted to marry a person of the same biological sex, see 10 U.S.C. § 654(b)(3); DOD Directive 1332.20 at 2-2(C)(1)(c).[3] "Homosexual" is defined as "a person, regardless of sex, who engages in, attempts to engage in, has a propensity to engage in, or intends to engage in homosexual acts, and includes the terms 'gay' and 'lesbian.' " Id. § 654(f)(1). "Homosexual act" means:
 
 
 5
 (A) any bodily contact, actively undertaken or passively permitted, between members of the same sex for the purpose of satisfying sexual desires; and
 
 
 6
 (B) any bodily contact which a reasonable person would understand to demonstrate a propensity or intent to engage in an act described in subparagraph (A).
 
 
 7
 Id. § 654(f)(3).
 
 
 8
 The DOD Directive under which Watson and Holmes were discharged provides, among other things:
 
 
 9
 Homosexual conduct is grounds for separation from the Military Services under the terms set forth in paragraph C.1.b, below. Homosexual conduct includes homosexual acts, a statement by a member that demonstrates a propensity or intent to engage in homosexual acts, or a homosexual marriage or attempted marriage. A statement by a member that demonstrates a propensity or intent to engage in homosexual acts is grounds for separation not because it reflects the member's sexual orientation, but because the statement indicates a likelihood that the member engages in or will engage in homosexual acts. A member's sexual orientation is considered a personal and private matter, and is not a bar to continued service under this section unless manifested by homosexual conduct in the manner described in section C.1.
 
 
 10
 DOD Directive 1332.30 at 2-1(C) (emphasis added). The Directive provides that the statement, "I am gay," is sufficient to trigger the presumption. Id. at 8-1(B)(4)(b).[4] Paragraph (C)(1)(b) spells out the findings required to rebut the presumption under the acts and statement prongs of § 654(b) in virtually identical terms to § 654(b)(1), (2), (3). Id. at 2-2(C)(1)(a)-(b).[5]
 
 Facts and Prior Proceedings
 
 11
 Watson. Watson enlisted in the United States Navy in 1981 and was promoted to the rank of lieutenant in 1991. His fourteen-year Naval career is marked with many awards and honors. Before initiation of his discharge proceedings, Watson served as an Assistant Professor of Naval Science in the Naval Reserve Officers Training Corps. On October 28, 1994, Watson delivered to his commanding officer a one-page document, entitled "Submission of Sexual Orientation Statement," in which he stated: "I have a homosexual orientation. I do not intend to rebut the presumption." The presumption referred to by Watson is the rebuttable presumption in 10 U.S.C. § 654(b)(2), which provides that a service member may rebut his statement of homosexuality by demonstrating that he is not a person who engages in, attempts to engage in, has a propensity to engage in, or intends to engage in homosexual acts. Watson stated that he submitted his statement of sexual orientation because of his commitment to honesty and desire to eliminate any potential for blackmail attempts in the future.
 
 
 12
 Based on Watson's letter, the Navy issued a show cause order, requiring Watson to show cause before a three-member Board of Inquiry why he should be retained in the Navy. The Board of Inquiry convened on March 1, 1995. Although the Board instructed Watson, who was represented by counsel, that he needed to rebut the presumption that he engages in or intends to engage in homosexual acts to avoid discharge, Watson presented no such evidence; instead, he presented evidence of his excellent service record. As a result, the Board unanimously recommended that Watson be honorably discharged "by reason of homosexual conduct." On March 28, 1995, Watson's civilian counsel submitted a Letter of Deficiency to the Commander of Naval Base Seattle and the Board of Review for their consideration in reviewing the Board of Inquiry's decision. The following statement by Watson was included with the letter:
 
 
 13
 a. I expressly deny that I have engaged in any homosexual conduct with any military student or service member.
 
 
 14
 b. I expressly deny that I engaged in any homosexual conduct during the performance of military duty, or while on any military installation.
 
 
 15
 c. I expressly deny that I have any intent or propensity to engage in any conduct described above.
 
 
 16
 The Commander concurred with the Board of Inquiry's findings, concluding that Watson's statement failed to address whether Watson had any intent or propensity to engage in off-base, off-duty homosexual conduct with nonmilitary personnel and that the statement therefore failed to rebut the presumption of homosexual conduct. He recommended to the Chief of Naval Personnel that Watson be discharged. Both the Board of Inquiry and the Commander rejected Watson's argument that, because he was not represented by counsel when he submitted his original statement about his intention not to rebut the presumption, that statement should be construed to mean only that he did not want an embarrassing inquiry into his private life. The Board of Review voted unanimously to recommend Watson's separation from service with an honorable discharge. In June 1995, the Navy notified Watson that he would be discharged from the Navy in July 1995.
 
 
 17
 On July 25, 1995, Watson commenced this action for injunctive and declaratory relief against Secretary of Defense William J. Perry,[6] Secretary of the Navy John E. Dalton, and the United States. The complaint alleged that the basis for his impending discharge, the "don't ask/don't tell" policy, on its face or as applied, violates Watson's right to equal protection and substantive due process under the Fifth Amendment and to free speech under the First Amendment. It also alleged that the Navy's refusal to provide Watson full severance pay violates the Administrative Procedure Act ("APA"), 5 U.S.C. § 706. The district court preliminarily enjoined the Navy from discharging Watson or taking any adverse action against him pending the outcome of the litigation. We have ordered that the preliminary injunction remain in effect pending this appeal.
 
 
 18
 In March 1996, the district court granted summary judgment in favor of the government on Watson's constitutional claims. The court rejected Watson's argument that his discharge was based on speech regarding his homosexual orientation rather than homosexual conduct. Instead, the district court held that the "don't ask/don't tell" policy, as applied to Watson, was constitutional because his discharge was based on a likelihood of homosexual conduct by Watson, as inferred by his statements. The district court concluded that Watson failed to rebut the presumption in § 654 by upholding the government's inference from Watson's statements that he manifested an intent or propensity to engage in off-base, off-duty homosexual conduct with nonmilitary personnel. Also based on the inference of Watson's conduct, the district court held that Watson's due process and First Amendment claims lacked merit. The district court entered judgment in favor of the government and dismissed without prejudice Watson's APA claim.
 
 
 19
 Holmes. Holmes enlisted in the CANG in 1986 and was sworn in as an officer in 1989. As a member of the CANG, Holmes participated in drills 48 times a year over weekends. Also in 1989, Holmes received a commission as an officer in the USANG. He earned many honors during his service, including promotion to First Lieutenant and Combat Military Police Platoon Leader. On June 3, 1993, represented by civilian counsel, Holmes voluntarily sent a memorandum to his commanding officer at the CANG, in which he stated, inter alia: "[A]s a matter of conscience, honesty and pride, I am compelled to inform you that I am gay." Based on this memorandum, the commanding officer initiated a request to withdraw Holmes's federal recognition as an officer in the USANG.[7]
 
 
 20
 On May 21, 1994, a Federal Recognition Withdrawal Board commenced proceedings to determine if Holmes's federal recognition should be withdrawn. CANG and USANG representatives attended the hearing. Holmes was represented by civilian and military counsel. Applying the DOD's new regulations under the "don't ask/don't tell" policy, the Board found that Holmes's admission of his sexual orientation triggered the presumption of homosexual propensity under § 654(b)(2) and required him to rebut that presumption to retain his federal recognition. Like Watson, Holmes presented only evidence of his excellent service record at the hearing. As a result, the Board recommended to the Chief of the National Army Guard Bureau, a joint bureau of the Departments of the Army and Air Force, that Holmes's federal recognition be withdrawn. The Chief reviewed and approved the Board's findings on September 12, 1994. In October 1994, the USANG discharged Holmes. Thereafter, in January 1995, the CANG notified Holmes of his discharge from the part of CANG subject to being called into federal service, based solely on his loss of federal recognition. Holmes currently holds an officer position in the state and United States reserve groups that does not require federal recognition and is not subject to being called into federal service.
 
 
 21
 In February 1995, Holmes commenced this action for injunctive and declaratory relief and for damages against the USANG, United States, and Secretary of Defense William J. Perry[8] (collectively "federal appellants"); and the CANG, Major General Tandy Bozeman, and California Governor Pete Wilson (collectively "state appellants"). His first amended complaint alleged thirteen claims based on California state law and the United States Constitution. In March 1996, the district court granted in part Holmes's cross-motion for summary adjudication with respect to his federal equal protection and free speech claims, alleged against all defendants. Specifically, the district court concluded that the presumption in § 654(b)(2), which is triggered by a statement of homosexual orientation, unconstitutionally punishes Holmes for speech and for status as a homosexual, rather than for conduct. The court also dismissed Holmes's remaining federal claims and dismissed without prejudice his state-law claims. The district court further ordered that Holmes be reinstated to the part of the CANG subject to being called into federal service and that his federal officer status in the USANG be restored. Holmes stipulated that he would not seek reinstatement pending this appeal.
 
 DISCUSSION
 I. STANDARD OF REVIEW
 
 22
 We review a grant of summary judgment de novo. Warren v. City of Carlsbad, 58 F.3d 439, 441 (9th Cir.1995), cert. denied, 516 U.S. 1171, 116 S.Ct. 1261, 134 L.Ed.2d 209 (1996). "We must determine whether the evidence, viewed in a light most favorable to the non-moving party, presents any genuine issues of material fact and whether the district court correctly applied the law." Id.
 
 II. ANALYSIS
 
 23
 The legal issue posed by these consolidated appeals is whether the military may discharge a service member based on an inference of homosexual conduct from his admission of homosexual orientation, without corroborating evidence of conduct or intent. The "don't ask/don't tell" policy expressly provides for the discharge of any service member who states that he is a homosexual unless he rebuts the presumption that he will likely engage in homosexual conduct. See 10 U.S.C. § 654(b)(2); DOD Directive 1332.30 at 2-2(C)(1)(b). Both Watson and Holmes challenged the constitutionality of the policy's presumption of homosexuality that is created solely by a statement of homosexual orientation, such as "I have a homosexual orientation" or "I am gay." The constitutionality of § 654(b)(2)-the statement prong of the military's new policy-is an issue of first impression in this circuit. Only the Second, Fourth, and Eighth Circuits have addressed this question to date. See Richenberg v. Perry, 97 F.3d 256 (8th Cir.1996) (holding that § 654(b)(2) does not violate the Fifth Amendment's equal protection component or the First Amendment right to free speech); Able v. United States, 88 F.3d 1280 (2d Cir.1996) (stating that if § 654(b)(1) was valid, § 654(b)(2) would also be valid but not deciding constitutionality of § 654(b)(1)'s prohibition against homosexual conduct); Thomasson v. Perry, 80 F.3d 915 (4th Cir.) (en banc) (holding that § 654(b)(2) does not violate the Fifth Amendment's rights to equal protection and substantive due process or the First Amendment's right to free speech), cert. denied, --- U.S. ----, 117 S.Ct. 358, 136 L.Ed.2d 250 (1996). For the following reasons, we follow the reasoning of Richenberg, Able, and Thomasson, and we conclude that § 654(b)(2) and its implementing regulations are constitutional on their face and as applied to Watson and Holmes.
 
 A. Equal Protection Challenge
 
 24
 We consider first whether the statute and implementing regulations, on their face and as applied,[9] violate the equal protection component of the Due Process Clause of the Fifth Amendment. We are guided in this inquiry by our recent decision in Philips v. Perry, 106 F.3d 1420 (9th Cir.1997), in which we upheld the acts prong of § 654(b)(1) against an equal protection challenge.
 
 1. Rational Basis Review
 
 25
 "The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." City of Cleburne v. Cleburne Living Center, Inc., 473 U.S. 432, 439, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985). We have held that "it is ... clear that there is an equal protection component of the Due Process Clause of the Fifth Amendment which applies to the federal government." High Tech Gays v. Defense Indus. Sec. Clearance Office, 895 F.2d 563, 570 (9th Cir.1990).
 
 
 26
 Because homosexuals do not constitute a suspect or quasi-suspect class, we subject the military's "don't ask/don't tell" policy to rational basis review. Philips, 106 F.3d at 1425 (citing High Tech Gays, 895 F.2d at 574); see also Romer v. Evans, 517 U.S. 620, ----, 116 S.Ct. 1620, 1627, 134 L.Ed.2d 855 (1996) (applying rational basis review and upholding an equal protection challenge to Colorado's Amendment 2, which prohibited any state or local legislative, executive or judicial action designed to protect homosexual persons). In order to show that the statute and accompanying regulations are invalid, Watson and Holmes must show that they are not rationally related to any legitimate governmental purpose. Heller v. Doe, 509 U.S. 312, 320, 113 S.Ct. 2637, 2642-43, 125 L.Ed.2d 257 (1993).
 
 
 27
 In a series of statements, the Heller Court made it clear that our inquiry is limited: "rational-basis review in equal protection analysis 'is not a license for courts to judge the wisdom, fairness, or logic of legislative choices,' " id. at 319, 113 S.Ct. at 2642 (quoting FCC v. Beach Communications, Inc., 508 U.S. 307, 313, 113 S.Ct. 2096, 2101, 124 L.Ed.2d 211 (1993)); "[a] statute is presumed constitutional ... and '[t]he burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it,' whether or not the basis has a foundation in the record," id. at 320-21, 113 S.Ct. at 2643 (quoting Lehnhausen v. Lake Shore Auto Parts Co., 410 U.S. 356, 364, 93 S.Ct. 1001, 1006, 35 L.Ed.2d 351 (1973)); and, "courts are compelled under rational-basis review to accept a legislature's generalizations even when there is an imperfect fit between means and ends," id. at 321, 113 S.Ct. at 2643.
 
 
 28
 Additionally, our review is especially deferential in the military context. Goldman v. Weinberger, 475 U.S. 503, 508, 106 S.Ct. 1310, 1313-14, 89 L.Ed.2d 478 (1986); see also Gilligan v. Morgan, 413 U.S. 1, 10, 93 S.Ct. 2440, 2445-46, 37 L.Ed.2d 407 (1973) ("[I]t is difficult to conceive of an area of governmental activity in which the courts have less competence."). As we recently recognized again in Philips, " '[r]egulations which might infringe constitutional rights in other contexts may survive scrutiny because of military necessities.' " 106 F.3d at 1425 (quoting Beller v. Middendorf, 632 F.2d 788, 811 (9th Cir.1980)). Accordingly, we must be careful to avoid substituting our judgment and our evaluation of the evidence to justify a policy. See Rostker v. Goldberg, 453 U.S. 57, 68, 101 S.Ct. 2646, 2653-54, 69 L.Ed.2d 478 (1981).
 
 2. Legitimate State Interest
 
 29
 Under rational basis review, we must initially examine the government's asserted interest in excluding those who engage in homosexual conduct from military service. The government contends that excluding homosexuals who engage in or have the propensity to engage in homosexual acts from military service furthers discipline and combat readiness in the military by preventing risks to unit cohesion posed by the presence of such homosexuals. See 10 U.S.C. § 654(a)(15). Although this interest is subject to criticism, see, e.g., Philips, 106 F.3d at 1434-38 (Fletcher, J., dissenting) (arguing that "unit cohesion" and other rationales are a pretext for the disapproval of homosexuality on the part of heterosexuals), the government's interest in maintaining effective armed forces has been repeatedly upheld by this circuit. Id. at 1425 ("[M]aintaining effective armed forces is indisputably a compelling governmental purpose."); Hatheway v. Secretary of the Army, 641 F.2d 1376, 1382 (9th Cir.1981) ("The government has a compelling interest in maintaining a strong military force. Underlying our holding in Beller was the judgment that those who engage in homosexual acts severely compromise the government's ability to maintain such a force. That judgment was the basis for our holding that the Navy's policy of discharging all such persons was constitutionally permissible."); Beller, 632 F.2d at 812 (Kennedy, J.) ("In view of the importance of the military's role, the special need for discipline and order in the service, the potential for difficulties arising out of possible close confinement aboard ships or bases for long periods of time, and the possible benefits to recruiting efforts, however, we conclude that at the present time the regulation represents a reasonable effort to accommodate the needs of the Government with the interests of the individual."). Other circuits have also concluded that the military has at least a legitimate interest in excluding service members who engage in homosexual conduct. See, e.g., Richenberg, 97 F.3d at 262 ("Military leaders have determined that excluding those with a propensity to engage in homosexual acts, like providing separate housing for men and women, reduces sexual tensions that would jeopardize unit cohesion, the cornerstone of an effective military."); Thomasson, 80 F.3d at 929; Walmer v. United States Dep't of Defense, 52 F.3d 851, 854-55 (10th Cir.) ("[W]e ruled in Rich that a compelling governmental interest supported the military policy requiring discharge of homosexuals."), cert. denied, --- U.S. ----, 116 S.Ct. 474, 133 L.Ed.2d 403 (1995); Woodward v. United States, 871 F.2d 1068, 1076-77 (Fed.Cir.1989); Dronenburg v. Zech, 741 F.2d 1388, 1398 (D.C.Cir.1984); Rich v. Secretary of Army, 735 F.2d 1220, 1228-29 (10th Cir.1984).
 
 
 30
 Because our own circuit precedent plus the authority from every other circuit court that has addressed this issue establishes that the military has a legitimate interest in discharging service members on account of homosexual conduct in order to maintain effective armed forces, we must reject Watson's and Holmes's argument that there is no legitimate government interest in excluding homosexuals from military service on account of homosexual conduct. As stated by the Fourth Circuit, "[a]ny argument that Congress was misguided in [concluding that homosexual conduct would affect military effectiveness] is one of legislative policy, not constitutional law." Thomasson, 80 F.3d at 929.
 
 3. Rational Relation
 
 31
 Watson and Holmes next contend that it is not rational for the government to presume from statements regarding homosexual orientation that they will likely engage in homosexual conduct. Watson and Holmes argue that the presumption of § 654(b)(2) and its implementing regulations lacks a rational relationship to a legitimate state interest because it allows for discharge based on homosexual status.
 
 
 32
 In Meinhold v. United States Dep't of Defense, 34 F.3d 1469 (9th Cir.1994), we considered an equal protection challenge to the military's old policy on homosexuals. Navy Petty Officer Meinhold was discharged after he made the statement "I am in fact gay." In assessing Meinhold's constitutional claims, we recognized the "serious question" raised by the military's apparent policy of presuming that persons of homosexual orientation would violate regulations: "Equating status or propensity with conduct or acts that are prohibited is problematic as well. The Supreme Court has long recognized the constitutional infirmity of penalizing status alone." Id. at 1478.
 
 
 33
 To avoid this constitutional difficulty, we interpreted the old policy regarding homosexuals in the military narrowly, relying on the fact that the military's policy did not appear to allow the discharge of a service member solely because of a homosexual orientation. Accordingly, the holding we reached was narrow:
 
 
 34
 We therefore hold that the regulation under which Meinhold was processed need not be construed so broadly as to raise constitutional concerns. It can reasonably be construed to reach only statements that show a concrete, fixed, or expressed desire to commit homosexual acts despite their being prohibited. The Navy adopted its regulation to Meinhold's statement of orientation alone and based his separation solely on his classification as a homosexual. His statement-"I am in fact gay"in the circumstances under which he made it manifests no concrete, expressed desire to commit homosexual acts. The Navy's presumption that Meinhold desires or intends to engage in prohibited conduct on this basis of his statement alone therefore arbitrarily goes beyond what [the military's] policy seeks to prevent. Accordingly, Meinhold's discharge on that basis cannot stand.
 
 Id. at 1479-80.[10]
 
 35
 Because we face a direct challenge to the statement prong of the military's new policy, we must now face the question we avoided in Meinhold: whether the military's presumption from a service member's statement of homosexuality that he or she will engage in homosexual conduct bears a rational relationship to the military's interest in maintaining effective armed forces. We are assisted in this regard by recent decisions from several other circuit courts.
 
 
 36
 In Thomasson, the Navy discharged Lieutenant Thomasson after he submitted a written statement indicating that he was gay and then failed to rebut the presumption by presenting any specific evidence about whether he engaged or intended to engage in homosexual acts. In holding that the presumption contained in § 654(b)(2) is rationally related to a legitimate state interest, the Fourth Circuit reasoned as follows:
 
 
 37
 We think, however, that the means chosen by Congress in the Act are rationally related to legitimate legislative ends. The presumption that declared homosexuals have a propensity or intent to engage in homosexual acts certainly has a rational factual basis. In fact, the presumption ... represents perhaps the most sensible inference raised by a declaration of one's sexual orientation.... Although Thomasson argues that some declared homosexuals have not engaged in and do not have a propensity or intent to engage in homosexual acts, "courts are compelled ... to accept a legislature's generalizations even when there is an imperfect fit between means and ends."
 
 
 38
 Id. at 930 (quoting Heller, 509 U.S. at 312, 113 S.Ct. at 2639) (citation omitted).
 
 
 39
 Similarly, the Second and Eighth Circuits also recently decided that the rebuttable presumption created by the statements prong is rationally related to the military's interest in preventing homosexual conduct, respectively reasoning that "the statements presumption of subsection (b)(2) substantially furthers the government's [important] interest ... in preventing the occurrence of homosexual acts in the military," Able, 88 F.3d at 1296; and that "it is rational to assume that both homosexuals and heterosexuals 'are likely to act in accordance with their sexual drives,' " Richenberg, 97 F.3d at 262 (quoting Steffan, 41 F.3d at 692).
 
 
 40
 We agree with the Second, Fourth, and Eighth Circuits on this issue. Although the legislature's assumption that declared homosexuals will engage in homosexual conduct is imperfect, it is sufficiently rational to survive scrutiny under Heller.
 
 
 41
 Moreover, even if Meinhold in fact did require a discharge to be based on more than a mere statement, the discharges of Watson and Holmes meet this standard. Their discharge orders were based on their initial statements plus their failure to present any evidence at their discharge hearings to rebut the presumption that a declaration of homosexuality evidences a propensity to engage in prohibited homosexual conduct. Thus, under the statements prong of the "don't ask/don't tell" policy, service members are not discharged for having a homosexual "status." The discharges result because of actual conduct or a propensity for conduct that is prohibited. Watson's and Holmes's respective declarations of homosexual orientation did not automatically lead to their discharge; rather, their declaration was coupled with their tacit acceptance of the link between their orientation and their conduct, as evidenced by their failure to show that they did not engage in, attempt to engage in, have a propensity to engage in, or intend to engage in homosexual acts. Although Watson presented a statement contending that he did not commit homosexual acts on base, on duty, or with other military personnel, neither Watson nor Holmes offered any evidence regarding off base, off duty activity, even though military regulations still reach the off base and off duty activities of military personnel. See 10 U.S.C. § 654(a)(10).
 
 
 42
 Watson argues that the rebuttable presumption procedure is meaningless because homosexual service members would be able to rebut the presumption only by denying their homosexual orientation. The district court record shows that the government presented evidence that service members had successfully rebutted the presumption in several cases. Although Watson persuasively argues that some of these cases involve extraordinary circumstances (e.g., one male service member stated at the hearing that he actually was confused about his sexuality but vowed abstinence, while another male service member was married to a woman at the time of the hearing), there were examples that were less unusual.
 
 
 43
 For instance, one female Naval officer admitted to her homosexuality but submitted a statement, in which she stated, inter alia, that she understands the rules against homosexual conduct and intended to obey those rules. Another female Naval officer stated that she was a lesbian but that the statement "in no way, was meant to imply [ ] any propensity or intent or desire to engage in prohibited conduct." Unlike Watson and Holmes, these two officers clearly stated that they would not engage in any homosexual conduct. Although the record also describes another successful rebuttal where the male service member was retained by the Air Force even though he apparently only presented evidence of being well-liked, the fact that other service members have successfully rebutted the presumption without denying their homosexual orientation undermines Watson's argument.
 
 
 44
 Last, Watson's and Holmes's argument that the policy, as applied, treats homosexual and heterosexual persons differently is also without merit. To the extent that Watson's and Holmes's argument is based on the fact that there is no presumption of prohibited conduct by heterosexuals, this difference is explained by the fact that "[h]omosexuals and heterosexuals are ... differently situated in that heterosexuals have a permissible outlet for their particular sexual desires whereas homosexuals in the military do not." Steffan, 41 F.3d at 692. Furthermore, the policy itself does not distinguish between persons of homosexual and heterosexual orientation, providing that any person who makes a statement of homosexual orientation is subject to the same rebuttable presumption that arose against Watson and Holmes.
 
 
 45
 In sum, we find that the presumption is rationally related to the government's interest of excluding persons from military service based on homosexual conduct. Accordingly, Watson's and Holmes's discharges were based on an inference of homosexual conduct and not on their homosexual orientation.
 
 B. Substantive Due Process Challenge
 
 46
 We have previously rejected claims similar to Watson's substantive due process claim. See Schowengerdt v. United States, 944 F.2d 483, 490 (9th Cir.1991) (stating that substantive due process claim with respect to the old policy was foreclosed by Bowers v. Hardwick, 478 U.S. 186, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986), Beller, and High Tech Gays ).
 
 C. First Amendment Challenge
 
 47
 Watson and Holmes contend that § 654(b)(2) and the accompanying directives violate the First Amendment because they target the expression of a gay identity without sufficient justification. They specifically complain that § 654(b)(2), which is triggered by a "state[ment] that one is a homosexual or bisexual, or words to that effect," reaches constitutionally-protected speech, and covers expressive behavior that is likewise protected by the First Amendment.
 
 
 48
 However, because Watson and Holmes were discharged for their conduct and not for speech, the First Amendment is not implicated. See Thomasson, 80 F.3d at 931-34 (holding that the statement prong of the "don't ask/don't tell" policy is not directed at speech and therefore does not violate the First Amendment); see also Pruitt v. Cheney, 963 F.2d 1160, 1164 (9th Cir.1991) (stating that Pruitt's discharge under the old policy following his admission of homosexual orientation was not based on speech). Although Pruitt involved the old policy, its reasoning--"Pruitt's admission, like most admissions, was made in speech, but that does not mean that the [F]irst [A]mendment precludes the use of the admission as evidence of the facts admitted"--applies equally to the application of the "don't ask/don't tell" policy. Pruitt, 963 F.2d at 1164 (citing High Tech Gays, 895 F.2d at 578-80).
 
 D. State Appellants' Challenge
 
 49
 Because we find that the statement prong is constitutional, we need not reach the reach the issue of whether the state of California may be held liable for the alleged unconstitutional application of the "don't ask/don't tell" policy in Holmes.
 
 E. Attorney's Fees, Costs, and Expenses
 
 50
 We deny Watson's and Holmes's requests for attorney's fees, costs, and expenses, pursuant to 28 U.S.C. § 2412, because they are not prevailing parties.
 
 III. CONCLUSION
 
 51
 For the foregoing reasons, we AFFIRM in Watson, REVERSE in Holmes, and DENY Watson's and Holmes's requests for attorney's fees, costs, and expenses.
 
 
 52
 REINHARDT, Circuit Judge, dissenting.
 
 
 53
 I respectfully dissent. I believe that discharging a serviceman on the basis of the statement "I am a homosexual," "I am gay," or "I am a lesbian" impermissibly burdens rights guaranteed by the First Amendment.[1] Accordingly, I would hold that 10 U.S.C. § 654(b)(2) and its implementing regulations are unconstitutional.[2]
 
 
 54
 I recognize that we are bound by this court's recent decision that the military may discharge service members who engage in homosexual conduct. See Philips v. Perry, 106 F.3d 1420 (9th Cir.1997). Although I must follow that decision here, I note that it is necessarily rooted in Bowers v. Hardwick, 478 U.S. 186, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986), a decision that I have previously described as similar in its bias and prejudice to Plessy v. Ferguson, 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256 (1896). I remain confident that someday a Supreme Court with a sense of fairness and an adequate vision of the Constitution will repudiate Bowers in the same way that a wise and fair-minded Court once repudiated Plessy. Indeed, I hope that day will not be long in coming.[3] In my view of the Constitution, there is no more justification for discrimination against individuals because of their sexual orientation, which is most frequently a happenstance of birth, than there is for discrimination against blacks, Hispanics or Asians--or against Catholics, Jews, or Muslims, who at least have the option to convert.
 
 
 55
 Nevertheless, the fact that conduct may be banned does not mean that speech may be also. Certainly, an admission of prohibited conduct, although speech, is an admission of an offense and may serve as the basis for discipline. However, admitting that one is homosexual is not admitting to an offense under the newly crafted and somewhat schizoid "Don't Ask, Don't Tell" policy. For, under that policy, homosexual status--being a homosexual--is not an offense. To the contrary, the military now purports to welcome into the service individuals who are homosexuals--but only so long as they don't engage in homosexual conduct.[4] This might appropriately be analogized to welcoming Jews to be a part of society so long as they do not attend synagogue or pray publicly or privately to G-d. Nevertheless, it is the policy that the President and the Congress in their collective wisdom have agreed upon.
 
 
 56
 While I have previously explained why I believe the status/conduct distinction to be irrational and without substance, Watkins v. United States Army, 837 F.2d 1428 (9th Cir.1988) (Reinhardt J., dissenting), the "Don't Ask, Don't Tell" policy adopts the opposite view.[5] The proponents of the status/conduct distinction seem to believe that classifications such as homosexual and heterosexual are based on something other than sexual conduct, perhaps one's taste in art, music, literature, dress, or the pursuit of a particular, if indefinable, "life-style." This argument confuses cause and effect. What makes a person a homosexual, or a heterosexual, is the abiding desire to engage in sexual conduct with persons of the same sex, or persons of the opposite sex. It is no secret, even to federal judges, that the sexual drive is a strong one. Sex is the elementary form of human activity and expression, and it provides the basis for the most important of human relationships, rivaled only by that of parent and child. It also provides the basis for distinguishing homosexuals from heterosexuals.
 
 
 57
 The complications regarding sexual preferences involve questions such as whether one is born with a particular orientation or acquires it, and whether one may constitutionally be forced to lead a sexless life in order to serve one's country as a member of the military.[6] Most persons are born with a particular sexual preference and in the vast majority of cases, it is heterosexual; a minority is born with homosexual preferences. In some cases, it may not be so clear what one's preferences are; in some cases there may be ambivalence; in some a preference for both sexes; and in some a complete lack of interest in sexual conduct. (The latter would appear to be the smallest group.) But the idea that persons should be compelled to surrender entirely the right to engage in sexual conduct if they wish to serve in the armed forces would seem to me clearly to conflict with the Constitution and in particular with substantive due process. Nevertheless, as I have acknowledged, that is not the current state of the law and I am bound to follow a view contrary to my own, pending a repudiation of Bowers by the Court or its issuance of an opinion construing Bowers to mean something other than what its authors intended.
 
 
 58
 In any event, the consequence of the military's artificial status/conduct distinction is that homosexual status is acceptable and not a ground for discharge. As the government says in its brief, under the new policy "sexual orientation is considered a personal and private matter and is not by itself a basis for discharge." (quoting DoD Directive 1132.30 at 2-1.) Only conduct is prohibited, and we must take that distinction, however fallacious it may be, at face value. That the regulation may draw irrational lines or establish arbitrary and unrealistic distinctions is not the issue here. I must proceed on the assumption that the prohibition against homosexual conduct is constitutional under Perry, and that nevertheless the military welcomes with open arms those persons of homosexual status. Accordingly, the question in this case is simply whether an admission of homosexual status may serve as the basis for discharge when the fact of that status does not.
 
 
 59
 It is evident to me that if homosexual status is not a bar to service, admitting to that status--the statement that "I am a homosexual"--cannot itself be a cause for discharge. There can be nothing wrong about admitting to a status that is proper; yet what is being punished in the case before us is just that--the admission of a permissible status. Clearly, therefore, it is not the status that is being punished; it is the speech. Punishing speech that does no more than acknowledge a permissible status violates the First Amendment. There is no legitimate, let alone compelling, governmental interest in punishing a serviceman's acknowledgment that he is a member of a group that is eligible for military service.[7]
 
 
 60
 In the end, the drafters of the regulation are trapped by their own dissembling and by their desire to avoid facing a critical issue forthrightly. The "compromise" they have arrived at necessarily leads to disingenuous and arbitrary results. It will inevitably be enforced differently from base to base and will result in unfair and discriminatory treatment of many valued long-term members of the military service. Perhaps this is the nature of compromise, at least during the course of some administrations, especially where the military is involved. As the majority points out, the military is freer to infringe on individual rights than are other parts of government. Even that legal doctrine cannot, however, save a policy that is founded on an erroneous and wholly unsupportable presumption. Moreover, it is difficult to see how the military can benefit from a policy fraught with such patent disingenuousness. "Don't Ask, Don't Tell" seems entirely inconsistent with the proud traditions of our armed services, with the slogans such as Duty, Honor, Country, the Honor Codes, and the teachings that those who are wrongdoers or even know of wrongdoing are obligated to come forward and make full disclosure.
 
 
 61
 Hypocrisy about sexual conduct will undoubtedly continue to plague the military and disqualify some of its finest members from completing their careers, until some fundamental policy changes are adopted, and its sexual codes are made more realistic. From General Eisenhower on, up and down the ranks, even to Commander-in-Chief, there are many who would have had to forfeit their positions had the military's code of sexual conduct been strictly and honestly enforced. Instead, it is applied selectively, and frequently only when public whim or political pressures so dictate. The unfortunate few, ranging from highly qualified female Air Force Lieutenants to would-be Chiefs of Staff are the victims of a fickle public whose interest in the sexual conduct of members of the military waxes and wanes as other more titillating issues and events come to the forefront. However, those are matters for the military and the other branches of government to decide, not the courts. Hypocrisy and deception, if artfully practiced, do not offend the Constitution, at least not in most instances.
 
 
 62
 The government argues that "Don't Ask, Don't Tell" does not violate the free speech clause of the First Amendment because the speech is strong evidence of a "propensity to engage in homosexual acts" and that a "propensity" somehow qualifies as prohibited conduct. More to the point, the part of the policy that regulates speech is based on a presumption that a declaration of status establishes a propensity to engage in conduct--ergo, conduct. The tenuous connection the government seeks to draw between speech and propensity (and then between propensity and conduct) cannot withstand scrutiny under the First Amendment. The difference between being a homosexual and saying one is a homosexual is precisely that--one has said what is a fact. The presumption that one who speaks truthfully is more likely to engage in prohibited conduct than one who conceals or lies about his homosexual status is plainly unsupportable. It is at least as likely that the homosexual who has acknowledged his sexual orientation, and who knows that everyone is aware of his preferences, will be willing to refrain from conduct that would lead to his discharge as it is that a homosexual who has successfully concealed his status, leads a covert and secretive life and hopes not to be discovered, will refrain from "illicit" encounters. There is simply no rational basis for the presumption that those who are honest have a greater propensity to commit homosexual acts than those who prefer to hide their sexual proclivities. The presumption is of course also flawed in its underlying premise that homosexual orientation involves only an "abstract sexual preference ... as distinct from a propensity." As I have stated earlier, there is nothing abstract about the human sex drive. The thesis that being a homosexual, or having a homosexual orientation, does not entail a propensity or proclivity for a particular form of sexual activity, but that acknowledging one's homosexual status does, is consistent with neither the facts of life nor the plain meaning of the English language. While these artificial concepts of "orientation," "preference," "abstract sexual preference," "propensity," "proclivity" may be sufficient to support the policy's status/conduct distinction, they are far too evanescent and subtle to serve as a basis for prohibiting or punishing speech of substantive import.
 
 
 63
 The military's final argument is that there is a safety valve for those who acknowledge their status. They are permitted to overcome the rebuttable presumption that they have a propensity to engage in homosexual acts. There are several reasons why I find this argument erroneous. I will mention three. First, as I have stated, the presumption itself is invalid. Therefore, one may not be required to rebut it. Second, the opportunity to rebut the presumption is illusory in most cases. It is not only unreasonable to ask military personnel to remain chaste throughout their careers, it is contrary to both human nature and military tradition. In fact, from the earliest days of our military, R & R has involved far more than listening to the Philharmonic, touring art galleries, or watching the ballet. The military has actively facilitated a multitude of opportunities for members of the armed forces to release their sexual tensions, particularly, but hardly exclusively, when they are overseas. Third, the evidence the military has submitted regarding individual efforts to rebut the presumption raises serious doubts that the safety-valve serves any useful purpose whatsoever, notwithstanding the fact that on rare occasions an isolated service member has successfully availed himself of that procedure in order to escape discharge.
 
 
 64
 There can be no doubt that the "Don't Ask, Don't Tell" policy severely burdens speech. It unquestionably has the effect of chilling speech by homosexual service members--speech that is of tremendous importance to the individuals involved, speech that goes to their right to communicate the core of their emotions and identity to others. Given the regulation's provisions that permit homosexuals to serve in the armed forces, and that punish only homosexual conduct, there is no reasonable basis for prohibiting a service member from engaging in speech that serves only to declare his or her homosexual status.
 
 
 65
 Lieutenants Holmes and Watson will be discharged not because they have engaged in prohibited conduct and not because they are homosexual. Rather the military seeks to exclude them because they spoke openly of their homosexual status. The new "Don't Ask, Don't Tell" policy, while purporting to allow homosexuals to serve in this country's armed forces, unconstitutionally conditions their service on an abridgment of their free speech rights under the First Amendment. For that reason, I would hold the speech portion of "Don't Ask, Don't Tell" unconstitutional.[8]
 
 
 
 *
 Hon. Thomas M. Reavley, Senior United States Circuit Judge for the Fifth Circuit, sitting by designation
 
 
 [1]
 The "don't ask/don't tell" policy refers to 10 U.S.C. § 654 (Supp.1994) (codifying principal elements of the President's "Policy on Homosexual Conduct in the Armed Forces," announced July 19, 1993) and the Department of Defense's ("DOD") implementing regulations, effective February 28, 1994. See, e.g., DOD Directive 1332.30 (Separation of Regular Commissioned Officers) (Mar. 4, 1994). Because the regulations simply implement the policy of the statute in nearly identical terms, we refer interchangeably to § 654, the regulations, and the policy
 
 
 [2]
 The Servicemembers Legal Defense Network and the Northwest Women's Law Center filed a joint amicus brief in support of Watson and Holmes. The Family Research Council filed an amicus brief in support of the appellees in Watson, and a separate amicus brief in support of the federal appellants (the USANG, United States, and Department of Defense Secretary William J. Perry) in Holmes
 
 
 [3]
 Section 654(b) provides in full:
 (b) Policy. A member of the armed forces shall be separated from the armed forces under regulations prescribed by the Secretary of Defense if one or more of the following findings is made and approved in accordance with procedures set forth in such regulations:
 (1) That the member has engaged in, attempted to engage in, or solicited another to engage in a homosexual act or acts unless there are further findings, made and approved in accordance with procedures set forth in such regulations, that the member has demonstrated that--
 (A) such conduct is a departure from the member's usual and customary behavior;
 (B) such conduct, under all the circumstances, is unlikely to recur;
 (C) such conduct was not accomplished by use of force, coercion, or intimidation;
 (D) under the particular circumstances of the case, the member's continued presence in the armed forces is consistent with the interests of the armed forces in proper discipline, good order, and morale; and
 (E) the member does not have a propensity or intent to engage in homosexual acts.
 (2) That the member has stated that he or she is a homosexual or bisexual, or words to that effect, unless there is a further finding, made and approved in accordance with procedures set forth in the regulations, that the member has demonstrated that he or she is not a person who engages in, attempts to engage in, has a propensity to engage in, or intends to engage in homosexual acts.
 (3) That the member has married or attempted to marry a person known to be of the same biological sex.
 10 U.S.C. § 654(b) (emphasis added).
 
 
 [4]
 The Guidelines for Fact-Finding Inquiries Into Homosexual Conduct section of the DOD Directive provides:
 A "statement that a member is a homosexual or bisexual, or words to that effect," means (1) language or behavior that (2) a reasonable person would believe (3) was intended to convey the statement (4) that a person engages in, attempts to engage in, or has a propensity or intent to engage in homosexual acts. This may include statements such as "I am homosexual," "I am gay," "I am a lesbian," "I have a homosexual orientation," and the like.
 DOD Directive 1332.30 at 8-1(B)(4)(b).
 
 
 [5]
 As stated above, to rebut the presumption of homosexual conduct, a service member must demonstrate that he is not a person who engages in, attempts to engage in, has a propensity to engage in, or intends to engage in homosexual acts. 10 U.S.C. § 654(b)(2); DOD Directive 1332.30 at 2-2(C)(1)(b). Unlike the statute, the Directive defines "propensity to engage in homosexual acts":
 Propensity to engage in homosexual acts means more than an abstract preference or desire to engage in homosexual acts; it indicates a likelihood that a person engages in or will engage in homosexual acts. In determining whether an officer has successfully rebutted the presumption that he or she engages in, attempts to engage in, or has a propensity or intent to engage in homosexual acts, some or all of the following may be considered:
 (a) Whether the member has engaged in homosexual acts;
 (b) The officer's credibility;
 (c) Testimony from others about the officer's past conduct, character, and credibility;
 (d) The nature and circumstances of the officer's statement;
 (e) Any other evidence relevant to whether the officer is likely to engage in homosexual acts.
 (This list is not exhaustive; any other relevant evidence may also be considered.)
 Id.
 
 
 [6]
 Pursuant to Fed. R.App. P. 43(c), we have substituted present Secretary of Defense William S. Cohen for former Secretary of Defense William J. Perry
 
 
 [7]
 Federal recognition is the acknowledgement that an officer of a state national guard unit may become an officer of the United States Army National Guard and meets the requirements for holding such position in the USANG. 32 U.S.C. § 307(d)
 
 
 [8]
 See supra note 6
 
 
 [9]
 The district court in Watson held that application of the "don't ask/don't tell" policy was constitutional as applied to Watson and, therefore, did not reach Watson's facial challenge to the statute. In Holmes, it appears that the district court held that the statute's statement prong is facially invalid
 
 
 [10]
 While we hesitated in Meinhold to hold that it would be proper to infer homosexual conduct from a statement of homosexual orientation, the D.C. Circuit subsequently adopted the view that such an inference was entirely rational. See Steffan v. Perry, 41 F.3d 677, 688-90 (D.C.Cir.1994) (en banc) ("It is sufficient to recognize that the government's presumption, as embodied in the Academy regulations, is certainly rational given that the human sexual drive is enormously powerful and that an open declaration that one is a homosexual is a rather reliable indication as to the direction of one's drive.")
 
 
 [1]
 Hereafter, I use the term "homosexual" for purposes of simplicity, although I recognize that "gay" and "lesbian" is the preferred terminology
 
 
 [2]
 I use the term "policy" or "Don't Ask, Don't Tell policy" throughout to refer individually and collectively to the applicable statute, of which § 654(b)(2) is a part, and the pertinent Department of Defense Regulations. See 10 U.S.C. § 654(a)-(f) (1994); Department of Defense Directive ("DoD Dir.") 1332.30
 
 
 [3]
 The Court has imposed some restrictions on discrimination against persons because of their sexual orientation, although thus far only under highly limited circumstances. See Romer v. Evans, 517 U.S. 620, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996). It has never ruled on the issue of homosexuals in the military, or indeed on any other question involving homosexuals in government employment
 
 
 [4]
 The change in policy is evidenced by a change in the language of the regulations. Although the military formerly insisted that "homosexuality is incompatible with military service," it currently takes the position that "sexual orientation is considered a personal and private matter." DoD Dir. 1332.30 at 2-1
 
 
 [5]
 Some courts have agreed with the distinction, including the majority opinion in Watkins v. United States Army, 837 F.2d 1428 (9th Cir.1988)
 
 
 [6]
 See, Philips, supra
 
 
 [7]
 Pruitt v. Cheney, 963 F.2d 1160 (9th Cir.1991), is not to the contrary. Under the old policy at issue in Pruitt, servicemen were subject to discharge for being homosexual. "It was her homosexuality, and not her speech that caused Pruitt to be discharged.... Pruitt admitted homosexuality and was discharged for it." Id. at 1164. Under "Don't Ask, Don't Tell," homosexuality itself is not a cause for discharge
 I recognize that the majority's view is similar to that of the Second, Fourth, and Eighth Circuits. See Able v. United States, 88 F.3d 1280 (2d Cir.1996); Thomasson v. Perry, 80 F.3d 915 (4th Cir.1996); Richenberg v. Perry, 97 F.3d 256 (8th Cir.1996). While this must give me pause, I am still required to construe the Constitution as I understand it in light of binding Supreme Court precedent. While under the First Amendment speech may be limited in some circumstances, particularly in the military, see Greer v. Spock, 424 U.S. 828, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976), I find no legitimate interest that overrides the interest in free speech in this case. See Reno v. ACLU, --- U.S. ----, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997). I will discuss the sole justification offered by the government in the text infra at 11367-68.
 
 
 [8]
 The government does not argue that knowledge on the part of fellow service members of an individual's homosexual status would be sufficient in itself to warrant discharge in the absence of evidence of actual or threatened conduct. Accordingly, I will not address the arguments that might be advanced in support of such a contention other than to say that they would also fail to pass constitutional muster